# STATE OF CONNECTICUT *v.* JOSE B. MELENDEZ
## (SC 18052)

Rogers, C. J., and Norcott, Palmer, Vertefeuille and Schaller, Js.

Argued February 7, 2008—officially released May 26, 2009

*Elizabeth M. Inkster,* senior assistant public defender, with whom, on the brief, was *Jason Hollingsworth,* certified legal intern, for the appellant (defendant).

*Melissa L. Streeto,* assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *John Doyle,* assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. A jury found the defendant, Jose B. Melendez, guilty of two counts of sale of narcotics by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b),[1] and two counts of sale of narcotics within 1500 feet of a licensed child day care center in violation of General Statutes § 21a-278a (b).[2]

---

[1] General Statutes § 21a-278 (b) provides in relevant part: "Any person who . . . sells . . . any narcotic substance . . . except as authorized in this chapter, and who is not, at the time of such action, a drug-dependent person, for a first offense shall be imprisoned not less than five years or more than twenty years; and for each subsequent offense shall be imprisoned not less than ten years or more than twenty-five years. . . ."

Although § 21a-278 (b) was the subject of technical amendments in 2007; see Public Acts 2007, No. 07-217, § 97; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of § 21a-278 (b).

[2] General Statutes § 21a-278a (b) provides in relevant part: "Any person who violates section . . . 21a-278 by . . . selling . . . any controlled substance in or on, or within one thousand five hundred feet of, the real property comprising . . . a licensed child day care center, as defined in section 19a-77, that is identified as a child day care center by a sign posted in a conspicuous place shall be imprisoned for a term of three years, which shall not be suspended and shall be in addition and consecutive to any term of imprisonment imposed for violation of section . . . 21a-278. . . ."

The trial court, *Levin, J.*, rendered judgment in accordance with the jury verdict,[3] and the defendant appealed.[4] On appeal, the defendant claims that (1) the trial court violated his right to due process by denying his motion to compel the state to renew a plea offer that the defendant previously had rejected, (2) the trial court improperly permitted the state to introduce into evidence, in the absence of a proper foundation, a digital video disc (DVD) containing several video clips of the defendant's narcotics transactions, and (3) the assistant state's attorney committed certain improprieties during the evidentiary portion of the trial and during closing argument. We reject the defendant's claims and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In the fall of 2004, the federal Drug Enforcement Agency (DEA) and the statewide narcotics task force conducted a joint investigation into alleged narcotics trafficking at the Fireside Restaurant (restaurant) in New Haven. As part of that investigation, investigators used a confidential source, Jose Franco, to make controlled buys of narcotics at the restaurant.[5] Before entering the restaurant to perform the controlled buys, Franco was outfitted with a surveillance device hidden in his jacket that was designed to capture both audio and video of any drug transaction. That audio and video then would be transmitted, via wireless technology, to

[3] The trial court sentenced the defendant to a total effective term of thirty years imprisonment.

[4] The defendant appealed to the Appellate Court from the judgment of the trial court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[5] A controlled buy or purchase is a transaction directed by law enforcement officials whereby a cooperating individual is searched and provided with serialized money to obtain narcotics. After the cooperating individual has purchased narcotics, law enforcement officials again search that individual, retrieve the remaining serialized money and obtain the narcotics that the cooperating individual had purchased.

a nearby surveillance vehicle, in which law enforcement officials would record the transaction onto an eight millimeter videotape.

On the evening of October 8, 2004, Franco, who had in his possession $100 of buy money that had been provided to him by the law enforcement officials supervising his activities, entered the restaurant with instructions from those officials to attempt to purchase narcotics from anyone who was selling them. While in the restaurant's restroom, Franco encountered the defendant, whom Franco knew to be a drug dealer. Franco told the defendant that he wanted to purchase some cocaine, and the defendant gave Franco a small baggie containing a white powdery substance in exchange for $20. Franco left the restaurant after making the purchase and, immediately thereafter, met with the law enforcement officials who had sent him into the restaurant, including Special Agent John Rubinstein of the DEA. Rubinstein took the baggie containing the white powder from Franco along with the $80 in buy money that Franco still had in his possession. Rubinstein conducted a field test on the white powder, which tested positive for cocaine. On October 14, 2004, a substantially similar transaction occurred between Franco and the defendant in the restroom of the restaurant, where Franco again purchased from the defendant a $20 bag of white powder that field tested positive for cocaine.[6]

On the basis of Franco's identification of the defendant, the surveillance video and the field tests, the defendant was arrested on December 17, 2004, and charged with various narcotics offenses. Thereafter, in April or May, 2005, defense counsel was permitted to view the eight millimeter videotape on which the two

---

[6] Thereafter, laboratory tests performed by a DEA chemist on the white powder that Franco had purchased on October 8 and 14, 2004, confirmed that the powder was, in fact, cocaine.

transactions originally were recorded. In December, 2005, Rubinstein provided a copy of the video of the two transactions to the state, and the state immediately provided a copy to defense counsel.[7]

At a pretrial hearing on December 21, 2005, the parties and the trial court, *Alexander, J.*, discussed the status of the case, including plea negotiations that apparently had been ongoing.[8] Defense counsel informed the trial court that the defendant himself had not yet viewed the video of the transactions, and arrangements were made to afford the defendant an opportunity to do so that same day. The court explained to the defendant that, although the state might be able to obtain a video-tape of better quality for trial, the defendant would be viewing a copy of the videotape that then was in the possession of the state.[9]

As of the date of the hearing, the state had not yet been required to reveal the identity of its confidential source, namely, Franco. Because the state had an obli-gation to provide the defendant with that information

---

[7] The copy of the video footage that the state received was on a standard "video home system" or "VHS" videotape, and presumably had been trans-ferred directly from the eight millimeter videotape on which the drug transac-tions originally were recorded by DEA personnel.

[8] It appears from the record that the court, *Alexander, J.*, was handling matters relating to any plea discussions in the case.

[9] Our review of the copy of the videotape that the defendant viewed on December 21, 2005, reveals that it does not contain the very first portion of the footage from the October 8, 2004 transaction that appeared on the original eight millimeter videotape. Our review of the footage contained on the original eight millimeter tape indicates that the portion missing from the videotape that the defendant viewed on December 21, 2005, is the portion that depicts Franco receiving a small bag of white powder from the defendant in exchange for a sum of money. The record does not reveal why that first portion of the October 8 transaction does not appear on the copy of the videotape that the defendant viewed on December 21, 2005. Defense counsel, however, was aware of the contents of the original eight millimeter video-tape, including the footage depicting the actual transaction, because, as we have explained, he previously had viewed that original eight millimeter videotape in April or May, 2005.

prior to trial, however, the assistant state's attorney explained that the state's outstanding plea offer of "five years flat to serve" would be withdrawn immediately at such time as the state was required to disclose that potential witness' identity to the defendant. The assistant state's attorney further indicated that, if the defendant wished to plead guilty thereafter, he would have to enter what the assistant state's attorney characterized as "open [guilty] pleas," with the sentence to be imposed in "the discretion of the court."[10] The assistant state's attorney also stated that, in light of the charges pending against the defendant, that sentence would fall somewhere between a minimum of eight years imprisonment and a maximum of twenty-five years imprisonment.

Sometime after viewing the video, the defendant rejected the state's offer of five years imprisonment and elected to proceed to trial. Following the defendant's decision to exercise his right to a trial, the state advised the defendant of Franco's identity.

Thereafter, on February 9, 2006, following the commencement of jury selection, the state provided the defendant with a DVD that, according to the state, had been created from the original eight millimeter videotape of the October 8 and 14, 2004 transactions. The DVD contained eight separate video segments, four that depicted the transaction of October 8 and four that depicted the transaction of October 14. Of the four video clips for each transaction, one was an exact duplicate of the surveillance footage of the transaction without any modifications, one contained that same footage slowed to 10 percent of normal speed, one was comprised of enhanced footage at normal speed, and one contained

---

[10] We presume that, under this potential resolution of the case, the defendant would be required to plead guilty without a promise by the state that it would support any request for leniency that the defendant might make.

enhanced footage slowed to 10 percent of normal speed.[11]

Following his receipt of the DVD, the defendant made an oral motion for specific performance of the last plea offer extended by the state prior to the disclosure of the DVD,[12] namely, the plea arrangement pursuant to which the defendant would be subject to a term of imprisonment of between eight and twenty-five years.[13] The court, *Levin, J.*, conducted a hearing on this motion on February 14, 2006, after the evidentiary portion of the defendant's trial had begun. At that hearing, defense counsel explained to the court that, because the DVD contained images of the two transactions that could be seen more clearly and definitively than the images on the videotapes that he and the defendant had viewed, the DVD effectively constituted new evidence that the

[11] The enhanced video footage displayed better contrast and clarity.

[12] We ordinarily refer to the specific performance of a plea *agreement*, not to the specific performance of a plea *offer*. In essence, the defendant sought an order requiring the state to renew its last plea offer. We note, in addition, that the defendant represented to the court that he would accept that last plea offer if the offer were renewed upon order of the court.

[13] We note that the record is not entirely clear as to whether the defendant was seeking specific performance of the state's initial five year plea offer, or the second plea offer that called for the defendant to serve a prison term of between eight and twenty-five years. In his brief to this court, however, the defendant has indicated that he was referring to the latter offer, a representation that we accept.

We further note that, although the defendant refers to that latter potential resolution of the case as a plea offer by the assistant state's attorney, it is unclear whether the assistant state's attorney was, in fact, treating it as such, or whether he merely was explaining the consequences that the defendant was likely to face if, after rejecting the state's original five year offer, the defendant nevertheless elected to plead guilty to all of the charges. Indeed, on appeal, the state asserts that it was not an offer at all. We need not resolve this dispute, however, in light of our determination that the trial court properly concluded that the defendant is not entitled to the remedy of specific performance. For purposes of this appeal only, we treat the comments of the assistant state's attorney concerning the defendant's possible guilty pleas and sentence of imprisonment of eight to twenty-five years as a plea offer by the state.

state previously had not made available to the defendant. Although defense counsel acknowledged that the state only recently had obtained the DVD and that, as far as he knew, the DVD had been created from the original eight millimeter videotape, counsel nevertheless maintained that, if he had received the DVD earlier, the defendant would have accepted the state's most recent plea offer. Finally, the defendant claimed that, in light of the fact that the state's disclosure of the DVD was so tardy, the state should be required to renew that offer.

The assistant state's attorney objected to the defendant's motion, claiming that, although the images on the DVD were clearer and more readily observable than the images on the videotapes, the DVD did not represent new evidence but, rather, a mere enhancement of the footage on the videotapes, of which defense counsel had been aware for some time. The assistant state's attorney further explained that he previously had informed defense counsel that the state was having a DVD made of the transactions, that the DVD footage would be of better quality than the original eight millimeter videotape, and that he would provide defense counsel with a copy of the DVD as soon as it was available. The assistant state's attorney also stated that he had, in fact, given a copy of the DVD to defense counsel immediately upon the state's receipt of the DVD. Defense counsel did not dispute these representations by the assistant state's attorney.

The trial court denied the defendant's motion, concluding that the defendant had not met his burden of establishing that the state should be required to renew its plea offer. In particular, the court found that defense counsel previously had been afforded the opportunity to review the same videotape that the state had used to make the DVD, and that the videotape and DVD depict exactly the same transactions. In essence, the

court rejected the defendant's contention that the DVD constituted new evidence merely because some of the video clips contained therein depict the transactions more clearly and, therefore, that it was easier to see on the DVD what also could have been seen on the original eight millimeter videotape.[14]

[14] For the first time on appeal, the defendant, in his initial brief to this court, claims that "the DVD version of the October 8, 2004 transaction . . . also included nine to ten seconds more footage than that which the state [previously] had given to the defense and which was shown to [the defendant] on December 21, 2005." The defendant further asserts that, "[t]his additional nine to ten seconds clearly showed the transfer of a plastic bag containing a white powder substance which was not evident in the video originally turned over, even if paused and played frame by frame." According to the defendant, "[t]he tape recording of the October 8, 2004 transaction began with the confidential informant handing money to the alleged seller. . . . It did not show the exchange of a bag containing white powder." (Citation omitted.) With respect to the transaction of October 14, 2004, the defendant contends that the original video "showed no transaction. . . . The only movement was of a plastic bag containing white powder from the alleged seller's right hand to his left hand." In its brief, the state responds in relevant part: "[T]he DVD showed nothing new or different [from] . . . the original videotapes of both transactions that the defendant had had in his possession since early in the case. Instead, it simply brightened up the rather dark images and slowed the transactions to [10 percent] of real time. Hence, the nine or ten extra seconds on the DVD that the defendant claims as new evidence exist because the footage is slowed to [10 percent] of real time. . . . Obviously, it takes longer to watch the footage in slow motion than it does to watch it at regular speed. The contents of the videos themselves were in no way altered, modified, added to, or subtracted from." (Internal quotation marks omitted.) The state responded further: "For instance, by watching the original [eight millimeter] videotape of the October 8 transaction frame by frame, one can clearly see the defendant handing Franco a white packet with one hand and taking money from Franco with the other." The defendant does not address this issue further in his reply brief.

On the basis of our review of the relevant videotapes, it appears that the parties' disagreement with respect to the transaction of October 8 is due to the fact that the defendant is referring to the copy of the videotape that the defendant himself viewed, which, as we have explained, does not depict the entire transaction of October 8, whereas the state is referring to the footage of the original recording on the eight millimeter videotape, which does. See footnote 9 of this opinion. With respect to the copy of the videotape of the transaction of October 14 that the defendant had viewed, it appears that that footage is the same as that depicted in the recording on the eight millimeter videotape. Our review of that footage indicates that it depicts

At trial, the state sought to introduce the DVD into evidence through Rubinstein, who, shortly before trial, had made arrangements to have the contents of the original eight millimeter videotape transferred onto the DVD by Detective John Brunetti of the West Haven police department. Although Rubinstein was present when Brunetti downloaded the contents of the eight millimeter videotape onto his computer's hard drive, copied it to the DVD and made the enhancements to the DVD footage, Rubinstein did not perform any of those tasks himself. Defense counsel objected to the admission of the DVD on the ground that the state had failed to lay an adequate foundation for its introduction into evidence because Rubinstein had provided no testimony concerning the process by which the enhancements to the surveillance footage were made when that footage was copied to the DVD. The trial court overruled the objection, and the DVD was admitted as a full exhibit.[15]

At the conclusion of the trial, the jury found the defendant guilty as charged. This appeal followed.

I

The defendant first claims that the state's allegedly tardy disclosure of the DVD violated his federal due process right to what he characterizes as a "meaningful"

the defendant in possession of a small bag of white powder. Moreover, our review of the slowed and enhanced DVD segments of the October 14 transaction reveals that they also depict the defendant in possession of a bag of white powder. We discern nothing else of substance, including money, in those slowed and enhanced DVD segments.

[15] In addition, the state also sought to introduce through Rubinstein several still photographs that had been generated from the video footage. The defendant also objected to the admission of the photographs, claiming that Rubinstein was unable to testify as to whether the photographs had been made from the original eight millimeter videotape or from the enhanced DVD footage. The trial court overruled the defendant's objection and permitted the state to enter the photographs into evidence. For purposes of this appeal, we treat the photographs in the same manner as the DVD.

plea bargain.[16] The remedy to which the defendant claims he is entitled for this alleged constitutional violation is the opportunity to accept the last plea offer that the state extended to him, that is, a plea arrangement pursuant to which the defendant would receive a sentence "in the eight to twenty-five year range." The defendant's claim lacks merit.

As the defendant concedes, "there is no constitutional right to plea bargain . . . ." *Weatherford* v. *Bursey*, 429 U.S. 545, 561, 97 S. Ct. 837, 51 L. Ed. 2d 30 (1977). "Neither must [a] prosecutor reoffer a previously rejected plea offer." *United States* v. *Wheat*, 813 F.2d 1399, 1405 (9th Cir. 1987), aff'd, 486 U.S. 153, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988); see also *United States* v. *Osif*, 789 F.2d 1404, 1405 (9th Cir. 1986) ("[t]he government is . . . under no obligation to reoffer an agreement that was previously rejected"). Thus, generally speaking, the decision whether to renew a plea offer that the defendant previously has rejected is a matter solely within the purview of the state, not the court. The defendant, moreover, has provided no authority for the principle that renewal of a previously rejected plea offer is an appropriate remedy for the state's tardy disclosure of material, inculpatory evidence. Nevertheless, this court has not ruled out the possibility that such a remedy might be appropriate. See *State* v. *Respass*, 256 Conn. 164, 188 n.19, 770 A.2d 471 (assuming, without deciding, that remedy of renewal of plea offer may be appropriate for state's tardy disclosure of incriminating evidence), cert. denied, 534 U.S. 1002, 122 S. Ct. 478, 151 L. Ed. 2d 392 (2001).

Even if that remedy may be appropriate in a particular case, the trial court did not abuse its discretion in

---

[16] The defendant also predicates his claim on the due process provisions of the state constitution. Because he has undertaken no independent analysis of his state constitutional claim, however, we address only his claim under the federal constitution. E.g., *State* v. *Johnson*, 288 Conn. 236, 244 n.14, 951 A.2d 1257 (2008).

rejecting it in the present case. First, there is nothing in the record to indicate that the timing of the state's disclosure of the DVD was the product of bad faith by the state. On the contrary, defense counsel expressly acknowledged that he was provided with a copy of the DVD immediately after the state had received it. Second, the trial court reasonably concluded that the DVD did not constitute new evidence that previously was unknown to the defendant because the DVD depicted the same two transactions as the original eight millimeter videotape that defense counsel had viewed, albeit in an enhanced format. Third, the record reflects that defense counsel had been advised that the state was having the DVD made and that he therefore was on notice that it likely would contain a better, more readily viewable depiction of the transactions.[17] Finally, the defense received the DVD five days before the start of the evidentiary portion of the trial, and the defendant does not persuasively claim that the receipt of the DVD at that time prejudiced the defense in preparing for or defending the case.[18] Cf. id., 186–88 (although state's

[17] Indeed, we know of no reason why the defendant himself could not have had a copy of the original eight millimeter videotape enhanced if he wished to learn more promptly what that enhanced version of the DVD was likely to reveal.

[18] In determining whether the state's disclosure of evidence is untimely for purposes of a claim seeking specific performance of a plea offer—a claim that we assume, arguendo, is recognized under the law—it is appropriate also to look at whether the disclosure was untimely for other purposes, and at the nature of the evidence withheld. This is so because the state may have legitimate reasons to keep a plea offer open only until it is required to turn over certain inculpatory evidence to the defendant. Indeed, this case presents such an example. The state kept its first, and best, offer open only until it was required to reveal the identity of its confidential source, Franco. Of course, the defendant is likely to want to know the identity and background of such a potential witness for plea bargaining purposes because that witness' background likely will bear on his or her credibility, which, in turn, is likely to affect the strength of the state's case, a consideration that invariably will be relevant to any possible plea bargain. Nevertheless, because the state has a legitimate interest in keeping the witness' identity confidential, the state certainly is entitled to hold open a plea offer only until it is obligated to disclose the identity of that witness to the defendant. Thus, not all delays

failure to disclose defendant's incriminating statement before hearing on motion to suppress was improper, defendant was not prejudiced by tardy disclosure, and trial court did not abuse its discretion in denying defendant's motion to suppress statement or in declining to require state to renew its original plea offer).

The defendant relies on *Sanders* v. *Commissioner of Correction*, 83 Conn. App. 543, 851 A.2d 313, cert. denied, 271 Conn. 914, 859 A.2d 569 (2004), to support his claim that he is entitled to specific performance of the state's last plea offer. The defendant's reliance on *Sanders* is misplaced. In *Sanders*, the petitioner established that his trial counsel had rendered ineffective assistance in failing to explain, in a meaningful manner, a plea offer that had been extended by the state. Id., 546. Because the petitioner also established that he would have accepted the offer if it had been explained properly to him, the habeas court granted his petition for a writ of habeas corpus and ordered that the sentence that he had received following trial be reduced to reflect the sentence contemplated by that plea offer. Id., 546–47. The Appellate Court affirmed the judgment of the habeas court. Id., 553.

The petitioner in *Sanders*, who did not avail himself of a favorable plea offer solely because of trial counsel's constitutionally deficient representation, surely was entitled to specific performance of that offer because no other relief would have been adequate to remedy the constitutional deprivation that he had suffered as a result of counsel's ineffective assistance. *Sanders* plainly is inapposite to the present case, however, because the defendant has not established a legally cognizable harm, let alone a deprivation of constitutional magnitude. In other words, the defendant cannot

---

in the disclosure of inculpatory evidence will render that disclosure untimely for purposes of a claim of specific performance of a plea offer.

demonstrate that he is entitled to *any* remedy due to the timing of the state's disclosure of the DVD because the trial court reasonably determined that the DVD was neither new evidence nor tardily disclosed. We conclude, therefore, that the defendant cannot prevail on his claim of entitlement to specific performance of the state's last plea offer.

II

The defendant next claims that the trial court improperly admitted the DVD that contained the original and modified[19] footage of the two narcotics transactions that occurred on October 8 and October 14, 2004. Specifically, the defendant contends that the admission of the DVD was improper because the state failed to lay a proper foundation for its introduction into evidence. Although we agree with the defendant that the trial court should not have admitted the portions of the DVD that contained the modified footage of the transactions, we conclude that it was not improper for the court to have admitted the footage that merely represented an exact copy of the footage from the original eight millimeter videotape. We also conclude that the state's use of the modified video footage was harmless beyond a reasonable doubt.

The following additional facts are necessary to our resolution of this claim. The state attempted to lay a foundation for the admission of the DVD by eliciting testimony from Rubinstein that he had hand delivered to Brunetti the original eight millimeter videotape containing the footage of the two transactions and that he was present when Brunetti downloaded the footage

[19] Our use hereinafter of the term "modified" with respect to certain of the DVD footage refers to the six video clips that either were enhanced, slowed to 10 percent of normal speed, or both. The remaining two video clips—one for each of the two transactions—are the unmodified video clips, which are comprised of footage that is identical to the footage contained in the original eight millimeter videotape of the two transactions.

from the eight millimeter videotape and transferred it onto the DVD. Rubinstein further testified that, although he had "approved" the modifications that were made to six of the video clips contained on the DVD, Brunetti actually made the modifications. On the basis of this testimony, the state sought to have the DVD admitted as a full exhibit. Defense counsel objected, claiming that Rubinstein had not testified with respect to the process by which the footage had been reproduced and then modified. The court overruled the objection, and the DVD was admitted into evidence as a full exhibit. In addition, the state also called William Hoffman, a New Haven police officer who had operated the recording equipment in the surveillance van on October 8 and 14, 2004. The assistant state's attorney proceeded to play for Hoffman the portion of the DVD that contained the enhanced, real time footage for each of the two transactions. Hoffman testified that each segment was an accurate representation of what he had viewed from the surveillance van when the transactions occurred. We now address the defendant's contention that the state failed to lay an adequate foundation for the admission of the DVD.

The defendant's claim is predicated on our decision in *State* v. *Swinton*, 268 Conn. 781, 847 A.2d 921 (2004), in which we established the standard for the authentication of computer generated evidence. Specifically, we held that in order to admit such evidence, the proponent must adduce testimony to establish that "(1) the computer equipment is accepted in the field as standard and competent and was in good working order, (2) qualified computer operators were employed, (3) proper procedures were followed in connection with the input and output of information, (4) a reliable software program was utilized, (5) the equipment was programmed and operated correctly, and (6) the exhibit is properly identified as the output in question." (Internal

quotation marks omitted.) Id., 811–12. The defendant contends, and the state concedes, that the admission of the portions of the DVD containing the modified footage was improper because the testimony adduced by the state did not satisfy the conditions for authentication set forth in *Swinton*. Fundamentally, the standard established in *Swinton* requires testimony demonstrating the reliability of the procedures used in creating the computer generated evidence sought to be admitted. See id., 812–13. Because the state adduced no such testimony in the present case, the trial court improperly admitted the portions of the DVD containing the footage that Brunetti had modified.

We reach a different conclusion, however, with respect to the portions of the DVD containing the footage that Brunetti did *not* modify, that is, the two video clips that are exact copies of the footage originally captured on the eight millimeter videotape while the transactions were occurring.[20] In *Swinton*, we acknowledged the difficulty in establishing a precise definition of what constitutes "computer generated" evidence. Id., 804. We did, however, draw a distinction between technologies that may be characterized as merely *presenting* evidence and those that are more accurately described as

---

[20] We note that the entire thrust of the defendant's claim, both at trial and on appeal, pertains to the inadmissibility of the *modified* portions of the DVD. Thus, the defendant does not appear to contend that the foundational requirements of *Swinton* apply to the footage that merely was taken from the eight millimeter videotape, transferred to the DVD and never modified in any way. Moreover, to the extent that language in the defendant's brief to this court arguably might be deemed to encompass such a claim, the defendant has failed to explain *why* such a foundation is necessary when the process involved has been demonstrated to result in nothing more than an exact copy of the original recording. In any event, even if the defendant's claim is generously construed to include the contention that the unmodified portions of the DVD footage also were inadmissible, we reject that contention for the reasons set forth in this opinion.

*creating* evidence.[21] Id. With that fundamental distinction in mind, we conclude that the portions of the DVD containing the exact duplicates of the original, unenhanced footage played in real time, simply do not constitute computer generated evidence for purposes of *Swinton*. Thus, to the extent that Brunetti merely transferred a copy of the contents of the original eight millimeter videotape to the DVD, that process, which Rubinstein witnessed, does not implicate the foundational standard that we adopted in *Swinton*. Although it is true, of course, that generating such a copy required the use of technology, that technology, which is widely used and readily available, involves nothing more than the reproduction of video footage from one medium to another. Indeed, the defendant has provided no reason why the admissibility of copies that are produced by that process—copies that have not been enhanced, altered or changed in any way—should be subject to the more rigorous requirements of *Swinton*. We conclude, therefore, that compliance with *Swinton* was not a prerequisite for admission of the unmodified video clips contained on the DVD.

Of course, that evidence nevertheless was subject to the same foundational requirements for admission as any other demonstrative evidence. "Such evidence should be admitted only if it is a fair and accurate representation of that which it attempts to portray." *Tripp* v. *Anderson*, 1 Conn. App. 433, 435, 472 A.2d 804 (1984). Rubinstein testified that the footage contained on the DVD was the same as the footage contained on the eight millimeter videotape on which the drug

---

[21] In *Swinton*, we explained that an image may be deemed to have been "creat[ed]" for present purposes when the technology used reveals details or parts of an image that were not visible prior to the technological enhancement or modification. (Internal quotation marks omitted.) *State* v. *Swinton*, supra, 268 Conn. 804 n.23. As a general matter, an image is merely "present[ed]"; id., 804; when the technology used to generate it does not reveal any new or previously unviewable details. See id., 804 n.23.

transactions were captured as they were taking place. Moreover, Hoffman, who operated the equipment when those recordings were made, testified that the footage contained on the DVD was the same as the footage that he observed when it originally was captured.[22] This testimony was sufficient to authenticate the unmodified video footage on the DVD. Consequently, that footage properly was introduced into evidence and considered by the jury.[23]

The defendant claims that the improper admission of the modified DVD footage violated his rights under the confrontation clause of the federal constitution[24] because he had no meaningful opportunity to challenge the legitimacy or propriety of the modification process pursuant to which that footage was created. The defendant therefore maintains that the state bears the burden of establishing that the impropriety was harmless beyond a reasonable doubt; see, e.g., *State* v. *Swinton*, supra, 268 Conn. 797 (impropriety of constitutional magnitude requires new trial unless state demonstrates that impropriety was harmless beyond reasonable doubt); a standard that the defendant claims the state cannot meet. The state contends that the improper admission of the modified footage of the two transac-

[22] As we previously noted, the actual video clips shown to Hoffman contained the enhanced, real time footage for each of the two transactions. Because there is no substantive difference between the content of the modified footage and the content of the unmodified footage, however, Hoffman's testimony authenticating the modified footage also served to authenticate the substantively identical, unmodified footage of the two transactions.

[23] The defendant has not challenged the admissibility, on foundational or other grounds, of the original footage of the two transactions that Hoffman recorded onto the eight millimeter videotape.

[24] The defendant also contends that the state's use of that evidence violated his rights under the analogous provisions of the state constitution, namely, article first, § 8, of the constitution of Connecticut. Because the defendant has not provided an independent analysis of his claim, we limit our review to his federal constitutional claim. E.g., *State* v. *Johnson*, 288 Conn. 236, 244 n.14, 951 A.2d 1257 (2008).

tions was evidentiary in nature and, therefore, that the defendant is entitled to a new trial only if he can demonstrate that "the jury's verdict was substantially swayed by the error"; *State* v. *Sawyer*, 279 Conn. 331, 357, 904 A.2d 101 (2006), overruled in part on other grounds by *State* v. *DeJesus*, 288 Conn. 418, 455 n.23, 953 A.2d 45 (2008); a standard that ordinarily is satisfied unless we have "fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Sawyer*, supra, 357. The state further asserts that, under that test, the improper admission of the modified footage was harmless. Although we acknowledged in *Swinton* that most foundational errors are evidentiary in nature; *State* v. *Swinton*, supra, 833; even if we assume, arguendo, that the impropriety in the present case violated the defendant's rights under the confrontation clause, we conclude that the error was harmless beyond a reasonable doubt.

First, the properly admitted *unmodified* DVD footage of the two transactions was substantively identical to the improperly admitted modified footage. The first of those two unmodified video clips depicts the October 8, 2004 transaction in its entirety, and the second clip, which depicts portions of the transaction of October 14, 2004, shows the defendant and Franco together in the restroom of the restaurant. That clip further shows the defendant move a small bag containing a white substance from his right hand to his left hand. This footage could be slowed or paused on a specific frame, with no improper alteration of the video, thereby allowing the members of the jury to focus on a particular aspect of the transactions during their deliberations. Although the jurors' access to the modified clips made it unnecessary for them to undertake such a review of the unmodified clips, the fact remains that the clips that were properly admitted and readily available to them contained the same images as the modified clips.

In such circumstances, the defendant cannot establish that he was harmed by the jurors' use of the modified clips.

The jury also had before it other strong evidence of the defendant's guilt. For example, Franco testified unequivocally that he had purchased cocaine from the defendant at the restaurant on each of the two occasions alleged by the state. Rubinstein's testimony about the controlled nature of the transactions buttressed Franco's eyewitness testimony. Finally, Franco's testimony that he had purchased the cocaine from the defendant was confirmed by the unmodified video footage of the two transactions; that footage removed any reservations that the jury otherwise might have had with respect to Franco's credibility. In light of the highly incriminating surveillance footage that was properly before the jury, Franco's testimony about the transactions, and the controlled nature of the two transactions, we conclude that the improper admission of the modified surveillance footage was harmless beyond a reasonable doubt.

## III

Finally, the defendant claims that the assistant state's attorney engaged in prosecutorial impropriety and that such impropriety requires reversal of the judgment of conviction on due process grounds. Specifically, the defendant contends that the assistant state's attorney improperly (1) elicited testimony concerning the defendant's prior criminal history, (2) used the terms "transaction" and "buy" to characterize the defendant's allegedly illegal conduct and elicited testimony that contained references to those terms even though the court had sustained defense counsel's objections to the use of those terms, and (3) made reference in closing argument to the fact that Franco had placed himself at risk

by testifying against the defendant. We reject each of these claims.[25]

"We begin our analysis by setting forth the applicable law regarding claims of prosecutorial impropriety. In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry. . . .

"[T]he touchstone of due process analysis in cases of alleged[ly] [harmful] prosecutorial [impropriety] is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's [actions at trial] so infected [it] with unfairness as to make the resulting conviction a denial of due process.

[25] The defendant also contends that the assistant state's attorney improperly failed to disclose the DVD in a timely manner. Although the defendant's contention is not supported by the record, we do not address this contention in the context of the defendant's claim of prosecutorial impropriety. We already have concluded that, with the exception of the portion of the DVD that contained an exact duplicate of the original footage of the two transactions—footage that defense counsel had viewed in April or May, 2005—the trial court improperly admitted the DVD. See part II of this opinion. We cannot see how prosecutorial impropriety can be established on the basis of an allegedly untimely disclosure of a DVD that should not have been introduced into evidence in the first place. Because the fairness of the trial rather than the culpability of the assistant state's attorney provides the basis for any due process claim, the defendant's right to a remedy with respect to the DVD depends solely on whether the state's use of that improperly admitted evidence was harmful. Consequently, our conclusion in part II of this opinion that the admission of the improperly admitted portions of the DVD was harmless beyond a reasonable doubt necessarily disposes of the defendant's claim that the allegedly tardy disclosure of the DVD requires a new trial.

. . . In determining whether the defendant was denied a fair trial . . . we must view the prosecutor's [actions] in the context of the entire trial. . . .

"[I]t is not the prosecutor's conduct alone that guides our inquiry, but, rather, the fairness of the trial as a whole. . . . We are mindful throughout this inquiry, however, of the unique responsibilities of the prosecutor in our judicial system. A prosecutor is not only an officer of the court, like every other attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his [or her] office, [the prosecutor] usually exercises great influence upon jurors. [The prosecutor's] conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he [or she] represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice or resentment. If the accused be guilty, he [or she] should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe." (Citations omitted; internal quotation marks omitted.) *State* v. *Fauci*, 282 Conn. 23, 32–33, 917 A.2d 978 (2007). With these principles in mind, we address each of the defendant's claims in turn.

The defendant first claims that the assistant state's attorney improperly elicited testimony from Rubinstein about the defendant's past criminal history. We disagree.

The following additional facts are relevant to this claim. On his direct examination of Rubinstein, the assistant state's attorney inquired whether Franco had informed Rubinstein of the defendant's identity following the first transaction on October 8, 2004. Rubinstein responded that Franco had, in fact, identified the defen-

dant by name. The assistant state's attorney then asked Rubinstein what action he had taken upon learning the defendant's name. Rubinstein responded: "[I]n addition to the name, [Franco] told me the person had some criminal history, which led me to inquire [of the] New Haven [police department] and [the National Crime Information Center about] the criminal history . . . ." Defense counsel objected and, outside the presence of the jury, moved for a mistrial on the ground that the defendant's criminal record was irrelevant and prejudicial. The trial court denied the motion but instructed Rubinstein to make no further mention of the defendant's criminal history. In addition, after the jury had been recalled, the court informed the jury that the objection had been sustained, that Rubinstein's answer had been stricken and that the jury was to disregard that answer. The following day, defense counsel renewed his mistrial motion, claiming prosecutorial impropriety. The assistant state's attorney responded that he had not intended to elicit any testimony from Rubinstein about the defendant's criminal history, to which Rubinstein had referred spontaneously. The trial court again denied defense counsel's motion, explaining that Rubinstein's reference to the defendant's criminal history had not been responsive to any question posed to him by the assistant state's attorney.

This allegation of prosecutorial impropriety is without merit because, as the trial court observed, the assistant state's attorney did not seek to elicit any testimony about the defendant's criminal record. Indeed, Rubinstein's testimony was not a foreseeable response to the assistant state's attorney's questioning on direct examination. An answer that a prosecutor reasonably could not have expected will not provide the basis for a claim that the prosecutor acted improperly in eliciting that response. In the absence of any indication that the assistant state's attorney's questioning of Rubinstein

was designed to adduce testimony concerning the defendant's prior criminal record, this claim of impropriety must fail.

The defendant next contends that the assistant state's attorney improperly used the terms "transactions" and "buys" and improperly elicited testimony that included the use of those terms. We also disagree with this claim. It is true that, during the course of Rubinstein's direct examination, both Rubinstein and the assistant state's attorney repeatedly characterized the two alleged drug sales with which the defendant had been charged as "buys" and "transactions." After one such reference, defense counsel objected to the use of the term "buys." The court sustained the objection and instructed the jury to disregard the term. Thereafter, both the assistant state's attorney and Rubinstein made several further references to the alleged drug sales as "transactions" and "buys," and defense counsel continued to object to those references. The trial court sustained these objections and instructed the assistant state's attorney and Rubinstein to use the word "incident" or "incidents." The next day, the defendant moved for a mistrial, in part on the basis of the use of the terms "transactions" and "buys" by Rubinstein and the assistant state's attorney. The trial court denied the motion, stating that, in retrospect, the record supported the use of those terms in characterizing the defendant's alleged illegal drug activity.

We agree with the trial court that the use of those terms by the assistant state's attorney and Rubinstein was not improper. The evidence clearly supported the state's theory that the defendant had engaged in the sale of drugs to Franco on October 8 and October 14, 2004. In light of that evidence, the assistant state's attorney's shorthand reference to these alleged sales as "buys" and "transactions" was perfectly appropriate. Moreover, as the defendant himself acknowledges,

"[t]he sole defense theory, and hence the critical issue in this case was the erroneous identification of [the defendant] as the person who sold drugs to the informant Franco," and not whether Franco actually had engaged in a drug "buy" or "transaction." Consequently, the references to those terms by the assistant state's attorney and Rubinstein cannot be considered improper.

Finally, the defendant maintains that, in closing argument, the assistant state's attorney improperly referred to the fact that Franco had placed his safety at risk by cooperating with the state. The defendant claims that these comments were designed to, and did, prejudice the jury against the defendant. We also reject this claim.

At trial, Franco testified that he had placed himself at risk by assisting the DEA in making controlled buys of narcotics at the restaurant. He further explained that his willingness to testify at trial also had created safety concerns because, prior to his disclosure as an informant, his identity was not known to the targets of the investigation. Defense counsel raised no objection to this testimony. During closing argument, the assistant state's attorney indicated that the jury could infer that, because Franco's status as a confidential informant had been revealed, he had no motive to testify untruthfully. In particular, the assistant state's attorney suggested that it was unlikely that Franco would falsely incriminate someone in view of "the safety concerns that he had brought [on] himself" by cooperating with the DEA and then testifying about that cooperation.

The defendant does not claim that Franco's testimony was improper. The sole focus of the defendant's claim, rather, is the alleged impropriety of the assistant state's attorney's reference to that testimony during closing argument. In light of Franco's trial testimony concerning his belief that he had placed himself at risk by his cooperation—testimony about which the defense did not complain at trial and about which the defendant

does not complain on appeal—we cannot say that the assistant state's attorney's reference to that testimony during closing argument was improper. Although a prosecutor may not inject extraneous issues into a case during closing argument; e.g., *State* v. *Warholic*, 278 Conn. 354, 376, 897 A.2d 569 (2006); or inflame the passions of the jurors in arguing to the jurors; see, e.g., *State* v. *Peeler*, 267 Conn. 611, 650, 841 A.2d 181 (2004); a prosecutor generally is not prohibited from referring to facts in evidence during arguments to the jury. We acknowledge that the relevance of the challenged closing argument with respect to the issue of Franco's credibility was marginal. We also recognize that, in the absence of duly admitted evidence regarding a witness' safety concerns, argument by a prosecutor that highlights such concerns is likely to give rise to an undue risk of inflaming the passions of the jurors. In the present case, however, the argument of the assistant state's attorney was supported by the record. Furthermore, although the assistant state's attorney referred to the issue of Franco's safety during his initial closing argument and his rebuttal argument, those references were isolated and relatively brief. Under the circumstances, therefore, we are not persuaded that the argument constituted prosecutorial impropriety.[26]

The judgment is affirmed.

In this opinion the other justices concurred.

---

[26] The defendant also requests that we reverse the judgment of conviction in the exercise of our inherent supervisory authority over the administration of justice. See *State* v. *Camacho*, 282 Conn. 328, 385 n.38, 924 A.2d 99 ("we may invoke our inherent supervisory authority in cases in which prosecutorial [impropriety] is not so egregious as to implicate the defendant's . . . right to a fair trial . . . [but] when the prosecutor deliberately engages in conduct that he or she knows, or ought to know, is improper . . . [and] when the [prosecutor's] conduct is so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integrity of the tribunal" [internal quotation marks omitted]), cert. denied, 552 U.S. 956, 128 S. Ct. 388, 169 L. Ed. 2d 273 (2007). Because we conclude that the assistant state's attorney engaged in no impropriety, we reject the defendant's claim.