******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

BETH ANN CARPENTER *v.* COMMISSIONER
OF CORRECTION
(AC 38139)

DiPentima, C. J., and Keller and Calmar, Js.

*Argued October 18, 2016—officially released March 28, 2017*

(Appeal from Superior Court, judicial district of
Tolland, Sferrazza, J.)

*Norman A. Pattis*, with whom was *Brittany B. Paz*,
for the appellant (petitioner).

*Michael J. Proto*, assistant state's attorney, with
whom, on the brief, was *Kevin T. Kane*, chief state's
attorney, for the appellee (respondent).

*Opinion*

DiPENTIMA, C. J. The petitioner, Beth Ann Carpenter, appeals from the judgment denying her amended petition for a writ of habeas corpus. On appeal, the petitioner claims that the court erred in denying her claims of ineffective assistance of counsel with respect to (1) her lost opportunity to pursue a plea bargain and (2) the exclusion of expert witness testimony regarding codependency syndrome. We disagree, and affirm the judgment of the habeas court.

In *State* v. *Carpenter*, 275 Conn. 785, 882 A.2d 604 (2005), cert. denied, 547 U.S. 1025, 126 S. Ct. 1578, 164 L. Ed. 2d 309 (2006), our Supreme Court set forth the following facts: "On March 10, 1994, at approximately 7:30 p.m., travelers on Interstate 95 discovered the body of the victim, Anson B. 'Buzz' Clinton III, lying in the roadway of exit seventy-two, known as the Rocky Neck connector, in the town of East Lyme. The victim had died as a result of multiple gunshot wounds to his head and upper body.

"In 1992, the victim met the defendant's sister, Kim Carpenter, at a bar where he performed as an exotic dancer. At the time, Kim and her two year old daughter, Rebecca Carpenter, lived with the defendant and their parents, Richard Carpenter and Cynthia Carpenter, at the Carpenters' home in Ledyard. Shortly after Kim met the victim, however, she moved out of the Carpenters' home and went to live with the victim at his parents' home in Old Lyme, showing no apparent concern for Rebecca and leaving her in the care of the Carpenters for significant periods of time.

"Thereafter, Cynthia Carpenter and the defendant, an attorney licensed to practice law in Connecticut, filed an application in the Probate Court seeking Kim's removal as guardian of Rebecca on the ground that Kim had abandoned Rebecca when she went to live with the victim. Cynthia Carpenter also filed a separate application for immediate temporary custody of Rebecca. According to the applications, Rebecca was developmentally delayed and required special care that Kim was not providing.

"In October, 1992, the court issued an ex parte order granting Cynthia Carpenter immediate temporary custody of Rebecca. The court also appointed a guardian ad litem to represent Rebecca's interests. In December, 1992, following an investigation by the department of children and families and upon the recommendation of the guardian ad litem, the Probate Court reversed the temporary order and returned guardianship and custody of Rebecca to Kim after she took certain court-ordered steps to improve her parenting skills.

"In January, 1993, Kim married the victim. Throughout that year, Cynthia Carpenter and the defendant continued to pursue litigation against Kim and the victim

concerning guardianship of Rebecca and related visitation issues. The defendant was motivated to assist her mother because she was concerned that Kim was not providing Rebecca with proper care and attention. She also believed that the victim was abusive toward Kim and Rebecca and that Kim was powerless to protect Rebecca from harm. In addition, she was distressed by reports that the victim might leave Connecticut with Kim and Rebecca and that she and the Carpenters no longer would be able to see the child.

"In November, 1992, Haiman Clein hired the defendant as an associate in his law firm, Clein and Frasure. In 1993, the defendant moved out of her parents' home and into an apartment in Norwich. At the end of November, 1993, the defendant, who was thirty years old, and Clein, who was fifty-two years old, began a torrid affair. Although Clein was married and the father of four children, he once told the defendant that a book about sexual obsession entitled 'Damaged' accurately summed up his feelings about their relationship.

"By early December, 1993, the defendant had become so worried about Rebecca's safety that she asked Clein to kill the victim. Clein initially refused, but later told the defendant that he knew someone by the name of Mark Despres who might be willing to do the job, at which point the defendant instructed Clein to make the necessary arrangements.

"When Clein subsequently met with Despres in his New London office, he explained that he was involved with a woman whose niece was being abused and that the only way to stop the abuse was to kill the abuser. After further discussion, Despres agreed to kill the victim for $8500. The defendant gave Clein the victim's purported home and work addresses, a description of the victim's car and a photograph of the victim, all of which Clein passed on to Despres so that he would be able to locate and identify the victim. Clein also gave Despres approximately $2000 toward payment of his fee.

"In mid-February, 1994, Clein told Despres not to kill the victim because he was upset with the defendant and no longer wanted to help her. Although the defendant initially appeared to accept Clein's decision, she came to him three or four weeks later in a state of hysteria after hearing from her family that Rebecca had a burn mark on her back and had been locked in the cellar by the victim. In light of these alleged events, the defendant told Clein that she wanted the victim killed and would be willing to pay for it herself.

"The following day, Clein invited Despres to his New London office and asked him to proceed with the killing. Despres indicated that he would do as Clein requested for $5500, less than the agreed upon amount, but that he wanted more money that day. Clein assented and

the two men went to the bank, where Clein withdrew $1000 and gave it to Despres.

"In early March, 1994, Despres learned through a newspaper advertisement that the victim was selling a tow truck. Despres called the victim, representing himself as a buyer, and arranged to meet the victim. On March 10, 1994, Despres, accompanied by his fifteen year old son, Chris Despres, met the victim in the parking lot of a Howard Johnson's restaurant on Interstate 95. After a short conversation, the victim agreed to show the tow truck to Despres, who followed the victim northbound on the interstate to exit seventy-two. As they exited, Despres flashed his headlights, causing the victim to pull over and stop on the shoulder of the roadway. Despres pulled over directly behind the victim. After the two men got out of their cars, the victim approached Despres and asked what was going on. Despres responded that he was looking for a gas station. He then fired six shots at the victim. When headlights appeared from behind, Despres jumped back into his car and sped away to his home, driving over the body as he fled from the scene. Moments later, the occupants of the approaching vehicle discovered the victim's body lying on the roadway and notified the police.

"Early the following morning, Cynthia Carpenter read about the incident in the newspaper and telephoned the defendant to inform her of the victim's death. The defendant immediately called Clein, who rushed to her apartment in Norwich. When Cynthia Carpenter later called the defendant to tell her that the Connecticut state police were coming to the Carpenters' home to question them about the incident, the defendant and Clein volunteered to come as well. Only after they answered every question asked by the state police, did the defendant and Clein depart.

"The defendant continued her relationship with Clein for the next eighteen months despite several unsuccessful attempts to end it. In January, 1995, she resigned from Clein's law firm to look for another position. Nine months later, she left the country to begin a new job in London.

"In December, 1995, the police issued a warrant for Clein's arrest and he fled from the state. Thereafter, the defendant was contacted by Scotland Yard and cooperated with British and United States law enforcement authorities in apprehending Clein. Notwithstanding his status as a fugitive, Clein wanted to stay in touch with the defendant. Accordingly, he and the defendant arranged to call each other at designated times, using pay telephone numbers in the United States and London. The defendant then informed the authorities of the time and place of the prearranged calls. Clein was arrested in February, 1996, during one such call from the defendant to a telephone number in California. Upon his arrest, Clein's last words to the defendant were: 'You

set me up . . . .'

"Following Clein's arrest, the defendant went to Dublin, Ireland, and was accepted into a commercial law program at University College Dublin. Although she attended courses for about two weeks, she was unable to continue because she could not afford the tuition. She thus began working at a local pub to save the required funds. In November, 1997, the defendant's plans were thwarted when she was arrested in connection with the victim's murder and imprisoned in Ireland for nineteen months.

"In June, 1999, the defendant waived extradition, was arraigned in New London Superior Court and was charged with capital felony, murder as an accessory and conspiracy to commit murder. After a two month trial, the jury returned a verdict of guilty on all three counts. The court merged the capital felony and murder convictions and sentenced the defendant on those two counts to a term of life imprisonment without the possibility of release. On the count of conspiracy to commit murder, the court sentenced the defendant to a term of twenty years imprisonment to be served concurrently with the preceding sentence." (Footnote omitted.) Id., 789–94. Our Supreme Court affirmed the judgment of conviction on direct appeal. Id., 789.

The petitioner initiated the present habeas corpus action in January, 2013, and in her amended petition for a writ of habeas corpus, the petitioner alleged, inter alia, that she was unlawfully confined as a result of the ineffective assistance of her trial counsel, Attorneys Hugh Keefe and Tara Knight.[1] With respect to those claims, the petitioner alleged that her trial counsel failed to adequately (1) counsel her regarding the advantages of negotiating a plea disposition and pursuing such negotiations, and (2) lay a proper evidentiary foundation for an expert witness.

After trial, the habeas court denied the petitioner's amended petition for a writ of habeas corpus. The court made credibility determinations and concluded that the petitioner failed to satisfy her burden of proof under *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), relating to each of her claims of ineffective assistance of counsel. With respect to her first claim, that her trial counsel were ineffective by failing to engage in plea negotiations on her behalf, the court concluded that the trial counsel's performance was not deficient. In support of its conclusion, the court reasoned that the petitioner was adamantly opposed to engaging in plea negotiations throughout the state's prosecution, she explicitly instructed counsel not to pursue a plea bargain, and the state was not interested in negotiating a plea. The court also concluded that the petitioner failed to demonstrate prejudice.

With respect to her second claim, that the petitioner's

trial counsel were ineffective in failing to lay a proper foundation for the introduction of expert testimony regarding codependency syndrome through Dr. Robert Novelly, the habeas court similarly concluded that the petitioner had failed to satisfy her burden under *Strickland*. Specifically, the court concluded that, because codependency syndrome was a novel concept at the time of the petitioner's trial, and counsel made a reasonable attempt to introduce Novelly's testimony by analogizing codependency syndrome evidence to other syndrome evidence, their performance was not deficient. The court also explained that she failed to demonstrate any resulting prejudice because, even if Novelly's testimony was introduced, evidence of codependency syndrome was compatible with the state's theory that the petitioner persistently requested and pressured Clein into arranging for the victim's demise. The habeas court subsequently granted the petition for certification to appeal, and this appeal followed.

As a preliminary matter, we note the applicable standard of review and governing legal principles. Our standard of review of a habeas court's judgment on ineffective assistance of counsel is well settled. "The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review." (Internal quotation marks omitted.) *Mozell* v. *Commissioner of Correction*, 291 Conn. 62, 76–77, 967 A.2d 41 (2009).

"A criminal defendant's right to the effective assistance of counsel . . . is guaranteed by the sixth and fourteenth amendments to the United States constitution and by article first, § 8, of the Connecticut constitution." *Small* v. *Commissioner of Correction*, 286 Conn. 707, 712, 946 A.2d 1203, cert. denied sub nom. *Small* v. *Lantz*, 555 U.S. 975, 129 S. Ct. 481, 172 L. Ed. 2d 336 (2008). "In *Strickland* v. *Washington,* [supra, 466 U.S. 687], the United States Supreme Court established that for a petitioner to prevail on a claim of ineffective assistance of counsel, he must show that counsel's assistance was so defective as to require reversal of [the] conviction . . . . That requires the petitioner to show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense [by establishing a reasonable probability that, but for the counsel's mistakes, the result of the proceeding would have been different]. . . . Furthermore, [i]n a habeas corpus proceeding, the petitioner's burden . . . is not met by speculation . . . *but by demonstrable realities*." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Farnum* v. *Commissioner of Correction*, 118 Conn. App. 670, 675, 984 A.2d 1126 (2009), cert. denied, 295 Conn. 905, 989 A.2d 119 (2010).

In order to prevail on the performance prong of *Strickland*, the petitioner must demonstrate that her "counsel made errors so serious that [counsel] was not functioning as the counsel guaranteed . . . by the Sixth Amendment. . . . The petitioner must thus show that counsel's representation fell below an objective standard of reasonableness considering all of the circumstances. . . . [A] court must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Citation omitted; internal quotation marks omitted.) *Axel D.* v. *Commissioner of Correction*, 135 Conn. App. 428, 433, 41 A.3d 1196 (2012).

"To satisfy the prejudice prong for ineffective assistance claims resulting from guilty verdicts, the petitioner must demonstrate that there exists a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. . . . A reasonable probability is one [that] is sufficient to undermine confidence in the result." (Internal quotation marks omitted.) *Orellana* v. *Commissioner of Correction*, 135 Conn. App. 90, 95–96, 41 A.3d 1088, cert. denied 305 Conn. 913, 45 A.3d 97 (2012). Guided by these principles, we address in turn each of the petitioner's ineffective assistance of counsel claims.

I

The petitioner first claims that her trial counsel were ineffective by failing to advise her of the advantages of negotiating a plea disposition and by failing to secure such a plea for her. We disagree, and conclude that the habeas court did not err in determining that the petitioner has failed to demonstrate either deficient performance or resulting prejudice.

The following additional facts are relevant to this claim. At the time of the petitioner's criminal trial, Kevin Kane was the state's attorney for the New London judicial district and prosecuted the charges against the petitioner. Kane testified at the habeas trial that he recalled that the petitioner was unwilling to make an unqualified admission of guilt with respect to the solicitation of the victim's murder. Kane also testified that he was uninterested in negotiating a plea without such an unqualified admission of guilt, and that he would have declined a proposed disposition by plea "that involved as few as thirty years [of] incarceration."

The petitioner's trial counsel, Keefe and Knight, also testified at the habeas trial. Keefe confirmed Kane's account that the petitioner was uninterested in resolving her case by plea. Knight testified to similar events. She explained that she had previously discussed with the petitioner the possibility of entering a guilty plea,

but that the petitioner adamantly was opposed to entertaining a guilty plea even if the state's attorney's "recommendation was as ridiculously low as five years to serve." On November 29, 2001, the petitioner memorialized that opposition in writing.[2]

In her testimony, the petitioner gave a different account. As the habeas court summarized in its memorandum of decision: "[The petitioner] stated that Attorneys Keefe and Knight never explained the elements of capital felony murder to her, never mentioned the possibility of a negotiated disposition, never informed her how severe the sentence was likely to be if she were convicted after trial, nor that lesser offenses were available. She denies telling [trial] counsel that a guilty plea was out of the question. She asserts that her written statement to the contrary was produced by the fear that her trial lawyers would abandon her if she refused to sign the document. As recounted previously, at the time of the homicide the petitioner was a trained lawyer, albeit with limited criminal law experience."

Following the habeas trial, the court rejected the petitioner's claim, finding that Kane and Knight's testimony was credible and that the petitioner's testimony was "implausible on this point." The court also relied upon the petitioner's unwillingness to engage in plea negotiations, the state's disinterest in plea bargaining without an unqualified admission of guilt from the petitioner, and the state's refusal to accept a plea that involved "as few as thirty years incarceration" in making its decision.

### A

We begin our analysis by examining the performance prong of *Strickland*. The petitioner argues that her trial counsel abandoned their role as counsel by failing to pursue and obtain a plea bargain because they had an affirmative obligation to do more than ratify their client's wishes. We disagree.

In her brief, the petitioner requests that this court impose a rule requiring counsel to seek a plea offer despite the petitioner's expressed intent to not enter a plea.[3] We note that " 'there is no constitutional right to plea bargain . . . .' *Weatherford* v. *Bursey*, 429 U.S. 545, 561, 97 S. Ct. 837, 51 L. Ed. 2d 30 (1977)." *State* v. *Melendez*, 291 Conn. 693, 704, 970 A.2d 64 (2009). Despite that maxim, the petitioner requests that this court adopt a rule that trial counsel is nonetheless required to seek a plea bargain notwithstanding their client's expression to the contrary. We decline to adopt such a rule.

The authority that the petitioner relies upon in arguing that trial counsel "must do more than ratify" their client's wishes, describes a narrow obligation imposed upon defense counsel under specific circumstances, i.e., when the state has *actually* offered a plea.

Specifically, that authority explains that defense counsel's performance may be deficient by either providing inadequate advice to the accused relating to the risk of conviction and the advantages of entering a plea, or by simply failing to convey the legitimate plea offer from the state to the accused. See *Missouri* v. *Frye*, U.S. , 132 S. Ct. 1399, 182 L. Ed. 2d 379 (2012) (holding that consideration of plea offers falls under Sixth Amendment right to effective assistance of counsel and that trial counsel has general duty to communicate formal plea offers from state to accused); *Lafler* v. *Cooper*, U.S. , 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012) (holding that trial counsel's ineffective advice to reject plea offer can result in prejudice if there is reasonable probability that offer would have been presented to the court, terms would have been accepted by court, and conviction or sentencing would have been less severe had accused accepted plea offer); *Boria* v. *Keane*, 99 F.3d 492, 495 (2d Cir. 1996) (explaining that trial counsel has obligation to advise client regarding whether particular plea to charge is desirable).

In the present case, there was no plea offer extended by the state to either the petitioner or her trial counsel. This is a critical factor because the cited authority is premised on the notion that counsel's performance can be deficient depending on how they convey or advise the accused regarding a legitimate plea offer. Simply put, there was no opportunity for the petitioner's trial counsel to misadvise her with respect to a plea offer from the state, because no offer was conveyed. As a result, the cited authority does not control the case before us.

Moreover, the petitioner clearly communicated, verbally and in writing, that she had no intention to accept responsibility for the charged offenses, and instructed counsel to not pursue a plea. Suggesting, as the petitioner does, that trial counsel should have pursued a guilty plea, when their client maintained her innocence and sought exoneration through a jury trial is illogical. We agree with the habeas court that the petitioner's trial counsel "cannot be faulted for adhering to their client's strong desire to seek vindication through a jury trial rather than accept even a minimal term of imprisonment in exchange for admitting guilt." Accordingly, the petitioner has not satisfied her burden under the performance prong of *Strickland*.

### B

Even if we were to assume that the petitioner had satisfied her burden under the performance prong of *Strickland*, she cannot establish that any resulting prejudice occurred. The petitioner is required to demonstrate that, but for her trial counsel's ineffective assistance, there is a reasonable probability that she would have accepted a plea offer or that the outcome of her criminal proceeding would have been different.

See *Anderson* v. *Commissioner of Correction*, 313 Conn. 360, 376, 98 A.3d 23 (2014), cert. denied sub nom. *Anderson* v. *Semple*, U.S. , 135 S. Ct. 1453, 191 L. Ed. 2d 403 (2015). Because the petitioner has not satisfied that standard, her claim of ineffective assistance of counsel fails.

In her appellate brief, the petitioner acknowledges that "[b]ecause no plea offer was ever conveyed, it cannot be said with any degree of certainty whether [she] would have accepted anything the state offered had she been adequately counseled." In light of this statement and the record before the habeas court, we agree with that court that there is no reasonable likelihood that the petitioner would have accepted a plea offer, or that the state was even willing to convey such an offer.

In arriving at our conclusion, we are mindful that the habeas court found that "the petitioner adamantly opposed any guilty plea even if the state's attorney's recommendation was as ridiculously low as five years" and that even if the petitioner's counsel made a plea offer to the state, "Kane would have rejected any offer proposed by the petitioner's counsel which fell short of a very lengthy prison sentence." Those findings are supported by the record before us. Further, there was no indication from the record that either the petitioner or the state was willing to engage in meaningful plea negotiations, or that the parties would have agreed on a plea bargain. Suggesting an alternative outcome is pure speculation, therefore, the petitioner has not demonstrated a reasonable probability that a different outcome would have resulted but for the alleged deficient performance. Accordingly, we reject the petitioner's claim of ineffective assistance of counsel.

II

The petitioner next claims that trial counsel were ineffective for failing to lay a sufficient evidentiary foundation to introduce expert testimony from Novelly regarding codependency syndrome. Specifically, the petitioner argues that her trial counsel's failure to introduce Novelly's testimony was based upon poor preparation and incompetent presentation. We disagree.

The following additional facts are relevant to this claim. At the petitioner's criminal trial, the state sought to introduce evidence "that the motive of this murder was the custody dispute and the involvement of the [petitioner] in this dispute with the victim." The state also sought to introduce details of the intimate relationship between the petitioner and Clein that continued following the commission of the crime. The petitioner filed a motion in limine "to preclude any evidence about the relationship between the [petitioner] and [Clein] after March 10th of 1994." In support of her motion, the petitioner argued that the state intended to introduce

evidence of their relationship to exhibit "consciousness of guilt," but argued that their relationship was not "legitimate consciousness of guilt evidence."

In response, the state argued that it was not offering the evidence to demonstrate the petitioner's consciousness of guilt, but instead, to prove the petitioner's intent. The state argued that the petitioner and Clein "hired somebody to kill the [petitioner's] brother-in-law. The [petitioner], after having known, not only knew about it beforehand, but her behavior afterwards is consistent with her having wanted him to do that before it happened. You know, she didn't say, I don't want to have anything more to do with you, I'm going to the police, you killed my brother-in-law. She continues her affair with him and maintains her relationship. This is important circumstantial evidence of her knowledge and intent before the crime was committed." The court subsequently denied the petitioner's motion and explained that the petitioner's relationship with Clein following the crime was "relevant to [her] intent [and] to the elements of the conspiracy charge."

Also at the criminal trial, Clein testified, inter alia, that the petitioner was the primary motivator for the murder plot and that she requested that he make the necessary arrangements. Clein also testified that he spent a significant amount of time with the petitioner in the months following the victim's murder, and the petitioner continued working in his office until early 1995. According to Clein, their relationship continued until the petitioner left the country in the summer of 1995; thereafter, they frequently spoke over the phone. In February, 1996, Clein was arrested while speaking on the phone to the petitioner during a prearranged call.

The petitioner also testified at her criminal trial and denied that she requested that Clein arrange for her brother-in-law's murder. She insisted that she had no prior knowledge of Clein's involvement until after the murder, and claimed that Clein sought Despres' cold-blooded services without her knowledge or approval. On cross-examination, the petitioner conceded that she nevertheless remained romantically involved with Clein following the murder and that she did not report Clein's involvement to the police, despite her knowledge thereof.

In order to counter the argument that the petitioner's continued involvement with Clein suggested guilt, her trial counsel attempted to explain that she suffered from codependency syndrome. Knight later testified at the habeas trial that the petitioner's conduct in staying with Clein was central to the state's case and that, in her view, "a jury might think it would be nonsensical for somebody to stay with a man who just admitted murdering somebody." Trial counsel sought to introduce Novelly's testimony to "enlighten the jury as to the behavioral characteristics exhibited by persons

engaged in a codependent relationship." The primary purpose of Novelly's testimony was to show that codependent individuals cannot break free from a destructive relationship, despite their knowledge that the relationship is in fact destructive.

The petitioner's trial counsel submitted an offer of proof through Novelly on the issue of codependency syndrome. The petitioner argued that Novelly would testify "about codependency and how people . . . become completely dependent on a relationship . . . and cannot break away from it . . . ." In support of their argument, Keefe and Knight analogized codependency syndrome to evidence of battered woman's syndrome and abused child syndrome,[4] which the state objected to on the basis that the evidence was irrelevant and that codependency syndrome was a novel topic. After conducting a *Porter* hearing,[5] the trial court accepted the validity of Novelly's scientific methodology relating to codependency syndrome. The court, however, sustained the state's objections based upon the petitioner's failure to adduce evidence that Clein and the petitioner were diagnosed with codependency syndrome.

The petitioner's trial counsel were confident, at the time of her criminal trial, that an adequate foundation was presented through previously admitted evidence describing the petitioner's and Clein's relationship. Their understanding of the evidence presented led them to analogize the circumstances of this case to the necessary evidentiary foundation required to admit other syndrome evidence, namely, battered woman's syndrome and abused child syndrome. As discussed subsequently in this opinion, our Supreme Court later determined that trial counsel's logic was flawed on the petitioner's direct appeal.

A

We begin our analysis with the performance prong. The petitioner argues that her trial counsel's failure to introduce Novelly's testimony was due to poor preparation. We disagree, and conclude that the habeas court did not err in determining that the petitioner failed to demonstrate that her counsel's performance fell below a reasonable standard of professional competency. Specifically, we find support in the record indicating that: (1) codependency syndrome was a novel concept at the time of the petitioner's criminal trial, (2) the petitioner's counsel reasonably analogized the evidence of codependency syndrome to that of evidence of other prevailing syndromes, such as battered woman's syndrome and abused child syndrome, and (3) the inadmissibility of Novelly's testimony was not due to lack of preparation or professional diligence.

First, it is clear that, at the time of the petitioner's trial there was scarce authority, if any, regarding the

admissibility of codependency evidence in the context of this case. Our Supreme Court recognized as much in affirming the petitioner's convictions on direct appeal. See *State* v. *Carpenter*, supra, 275 Conn. 806. Our Supreme Court explained that "[i]ssues relating to the evidentiary foundation necessary to establish the relevance of expert testimony on syndrome behavior have been raised infrequently in Connecticut and, to our knowledge, only in the context of battered woman's syndrome." Id. Our Supreme Court then stated that "before an expert may testify as to the common effects of a codependent relationship on the behavior of the partners, diagnostic or expert testimony must be introduced to establish that the partners have personality types conducive to the formation of a codependent relationship." (Footnote omitted.) Id., 811–12.

This discussion was in response to the manner in which the petitioner's trial counsel presented Novelly's testimony at trial. Our Supreme Court even went so far as to identify what diagnostic or expert testimony may be sufficient.[6] We also recognize that our Supreme Court likely would not have ventured into as much detail had there been existing guidance on the issue of codependency in the context of this case. To that end, we agree with the habeas court that "[i]f the petitioner's direct appeal were merely a routine application of the rules of evidence, such elaborate guidance would have been unwarranted." In particular, the habeas court recognized that "[trial] counsel, the prosecution, and the trial court all regarded the admissibility of the features of codependency syndrome as novel." We thus conclude that evidence of codependency syndrome, in the context of this case, was a novel concept at the time of the petitioner's jury trial.

Next, because the introduction of codependency syndrome evidence in this context was a novel concept, the petitioner's trial counsel reasonably relied upon existing principles relating to the admissibility of other syndrome evidence in their attempt to introduce Novelly's testimony. It is worth mentioning that trial counsel, arguably, was not obligated to even put forth evidence of codependency syndrome, because our Supreme Court previously recognized that the failure to advance a novel theory or argument has long been recognized by state and federal courts to not constitute ineffective performance of counsel. See *Ledbetter* v. *Commissioner of Correction*, 275 Conn. 451, 461, 880 A.2d 160 (2005) (collecting cases), cert. denied sub nom *Ledbetter* v. *Lantz*, 546 U.S. 1187, 126 S. Ct. 1368, 164 L. Ed. 2d 77 (2006). This suggests that the attempt to advance the novel concept of codependency syndrome exceeded ordinary professional standards.

Ultimately we decline to scrutinize trial counsel's performance for failing to anticipate, at the time of the petitioner's trial, that our Supreme Court would

delineate the proper evidentiary standard in the future. Trial counsel understandably attempted to present Novelly's testimony under existing standards applicable to other syndrome evidence. The rubric upon which trial counsel relied provides that it is usually unnecessary to rely upon diagnostic evidence or that the witness even examine the alleged victim in order to admit syndrome evidence, as evidence that simply describes the relationship is sufficient for an expert to describe the general effects of battered or abused woman's syndrome, or abused child syndrome. *State* v. *Borrelli*, 227 Conn. 153, 164–65, 629 A.2d 1105 (1993). Although the trial court rejected their argument, the petitioner's trial counsel still recognized the negative inference from the continuing relationship, attempted to introduce expert testimony to mitigate the negative inference from remaining with Clein, and proceeded under an established rubric necessary to introduce evidence of battered woman's syndrome and abused child syndrome. Attempting to advance a novel concept that proves unsuccessful does not necessarily constitute deficient performance when there is a lack of established guidance. See *Ledbetter* v. *Commissioner of Correction*, supra, 275 Conn. 461.

Finally, we disagree that trial counsel's performance was the result of unpreparedness or due to a lack of professional diligence. Rather, the petitioner was required to show that the performance of her trial counsel was so deficient and their errors so serious that counsel were not functioning as counsel. *Quintana* v. *Warden*, 220 Conn. 1, 4, 593 A.2d 964 (1991). Those circumstances simply are not present here. Although the habeas court recognized that the performance of the petitioner's trial counsel "appeared erroneous," there was no established standard or legal norm to introduce evidence of codependency syndrome at the time of the petitioner's trial. Given the authority at the time, trial counsel nevertheless were prepared and adequately presented Novelly's testimony under an arguably analogous evidentiary standard, albeit one that was later determined not to apply.

In support of her argument that trial counsel were ill-prepared, the petitioner argues that the evidentiary foundation the court required in order to introduce another witness, Dr. James Merikangas, should have alerted trial counsel to the necessary foundation needed to introduce Novelly's testimony. This argument is, however, without merit. For one, the petitioner has not directed us to nor have we uncovered any authority that suggests that a trial court's evidentiary inquiry of one witness has any bearing on the inquiry of another witness. We are thus unwilling to accept the petitioner's argument, especially when the two witnesses are testifying on unrelated topics.

In sum, the performance of the petitioner's trial coun-

sel simply does not rise to the level of unprofessionalism necessary to conclude that their performance was deficient. Cf. *Caro* v. *Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1998) (explaining that counsel has obligation to conduct investigation to determine what experts are necessary and failure to do so may constitute ineffective assistance), cert. denied sub nom *Woodford* v. *Caro*, 527 U.S. 1049, 119 S. Ct. 2414, 144 L. Ed. 2d 811 (1999); *Bloom* v. *Calderon*, 132 F.3d 1267, 1271 (9th Cir. 1997) (concluding counsel's performance was deficient by "doing practically nothing" to prepare expert to testify), cert. denied, 523 U.S. 1145, 118 S. Ct. 1856, 140 L. Ed. 2d 1104 (1988); *Paine* v. *Massie*, 339 F.3d 1194, 1202 (10th Cir. 2003) (identifying ineffective assistance of counsel by failing to follow well-established, necessary procedures). Instead, their performance was based upon an inventive strategy that analogized the necessary evidentiary bases for the introduction of evidence of battered woman's syndrome and abused child syndrome to the facts of the petitioner's case. Thus, we conclude that trial counsel's performance did not fall below a standard of professional reasonableness, based upon the novelty of codependency evidence and counsel's reasonable reliance and presentation of existing legal norms relating to the introduction of other syndrome evidence. See *Michael T.* v. *Commissioner of Correction*, 307 Conn. 84, 101, 52 A.3d 655 (2012) ("the right to counsel is the right to effective assistance, and not the right to perfect representation"); *Quintana* v. *Warden*, supra, 220 Conn. 6 ("*Strickland* requires only reasonably effective assistance as measured by the standards of the bar generally").

B

We now turn to the prejudice prong of *Strickland*. Even if we were to assume that the petitioner satisfied her burden under the performance prong, her ineffective assistance of counsel claim nevertheless fails because she cannot prove resulting prejudice. In rejecting the petitioner's argument pertaining to the prejudice prong of *Strickland*, the habeas court weighed the potential benefits that Novelly's testimony would have provided to the petitioner's account of why she had remained with Clein, primarily providing scientific support to her claims. The habeas court reasoned that although Novelly's testimony would have helped bolster the petitioner's explanation of why she remained with Clein, "other, unrelated evidence was far more damning to the defense espoused at the jury trial."

The habeas court further explained that it was "highly likely that a jury would have accepted the prosecution's position on Clein's motivation under the codependency syndrome rather than the defense [because] the state's reasoning was compatible with the syndrome behavior and the testimony of Attorney [Jeremiah] Donovan and Joseph Jebran, while the defense theory was contra-

dicted by testimony of those witnesses."

According to Clein, the petitioner was involved in the solicitation of the victim's murder. In fact, Clein explained that he was acting in accordance with the petitioner's persistent demands that he arrange the victim's demise. Clein stated that he carried through with her demands as a proclamation of his love for her. This pressure, according to Clein, led him to retain Despres in an effort to end the victim's life.

We recognize that the introduction of Novelly's testimony would have potentially bolstered the petitioner's claim that she remained with Clein following the murder, despite her knowledge of his involvement, due to codependent tendencies. On the other hand, Novelly's testimony would have potentially explained why Clein obeyed the petitioner's demands to facilitate her brother-in-law's murder, based upon those same tendencies to seek approval and display his love for the petitioner by fulfilling her desires. Novelly's testimony would have supported either of these conclusions.

In addition, as the habeas court noted, at the petitioner's criminal trial, the jury was presented with damaging evidence through Donovan and Jebran, two relatively unbiased and neutral witnesses, that significantly undermined the petitioner's claim that she never requested that Clein devise a plan to kill the victim. Specifically, Donovan testified that Clein communicated with him shortly after Despres' arrest and informed him that the petitioner frequently had urged him to facilitate the victim's murder and that he "was so obsessed" with the petitioner. Further, Jebran, a former boyfriend of the petitioner, testified that the petitioner had "asked Jebran to kidnap the [petitioner's niece] and abscond with her and the petitioner." These events occurred years before the victim's murder and Clein's arrest. Simply put, the testimony of Donovan refuted the petitioner's claim that Clein lied about the petitioner's involvement, and the testimony of Jebran undermined the petitioner's credibility.

If Novelly's testimony was admitted into evidence, the jury still likely would have accepted the state's position that Clein acted in accordance with the petitioner's commands. This is true because the state's theory was compatible, even if Novelly's testimony was introduced, with the testimony of Donovan and Jebran. On the other hand, the introduction of Novelly's testimony had no impact on the independent testimony of Donovan and Jebran. The petitioner's credibility and her contention that she was not involved in Clein's operation were significantly impacted by their testimony, and it is not reasonably probable that the introduction of codependency syndrome evidence would have caused a different outcome.

For the foregoing reasons, we agree with the habeas

court that the petitioner did not satisfy her burden that there exists a reasonable probability that the lack of Novelly's testimony regarding codependency syndrome changed the outcome of her jury trial.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Keefe was initially retained as counsel, and Knight was appointed as a special public defender to serve as co-counsel.

[2] The petitioner's signed statement provided: "That Attorneys [Keefe] and [Knight] have advised me of the consequences of a conviction of Capital Felony Murder, i.e., life in prison without the possibility of parole. That we have also discussed the possibility of my counsel approaching the State's Attorney's Office to discuss a disposition via plea negotiation. That I am not interested in any plea bargain or plea disposition and I have instructed Attorneys Keefe and Knight not to engage the prosecution in any such discussions. In fact, I have told them that even if offered a sentence of five years in prison, I would not take it."

[3] The petitioner stated that she "raises a legal issue of first impression: to wit, whether counsel for a defendant are required to seek a plea offer from the state even if the client expresses an intention to enter no plea and demands a trial."

[4] Keefe explained that: "[Novelly] is not being offered as someone who has examined [the petitioner], he is not being offered as someone who even knows the evidence in this case. He's being offered as an expert in this field as an aid to the jury to explain to them this psychological phenomen[on] that does exist that people can be dependent so much on another person; even though that relationship is bad for them, they continue it. It is common, in fact, in cases in criminal courts of this state to permit that testimony of battered women syndrome cases and in rape cases and in child sexual molestation cases where the expert is permitted to testify although it has nothing to do with the case, has no personal contact with the defendant or the victim, but is permitted to explain to the jury a psychological phenomen[on] in how their action, people in these situations are prone to act."

[5] "In *State* v. *Porter*, [241 Conn. 57, 698 A.2d 739 (1997)], our Supreme Court adopted the test for determining the admissibility of scientific evidence set forth in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). In so doing, our Supreme Court noted two threshold requirements to the admissibility of scientific evidence. First, that the subject of the testimony must be scientifically valid, meaning that it is scientific knowledge rooted in the methods and procedures of science . . . and is more than subjective belief or unsupported speculation. . . . This requirement establishes a standard of evidentiary reliability . . . as, [i]n a case involving scientific evidence, evidentiary reliability will be based upon scientific validity. . . . Second, the scientific evidence must fit the case in which it is presented. . . . In other words, proposed scientific testimony must be demonstrably relevant to the facts of the particular case in which it is offered, and not simply be valid in the abstract. . . . In *Porter* [our Supreme Court] recognized that *Daubert*'s vagueness as to how and when to apply the factors of the [*Daubert*] test was necessary. . . . In order to maintain flexibility in applying the test, we did not define what constitutes scientific evidence. . . . Consequently, our initial inquiry is whether the [evidence] at issue . . . is the type of evidence contemplated by *Porter*. . . . The hearing in which this judicial assessment occurs is referred to as a *Porter* hearing." (Citations omitted; internal quotation marks omitted.) *Arthur* v. *Commissioner of Correction*, 162 Conn. App. 606, 621–22, 131 A.3d 1267, cert. denied, 323 Conn. 915, 149 A.3d 496 (2016).

[6] The Supreme Court provided further guidance on the issue of codependency in a footnote and stated: "Expert testimony that the partners have personality types conducive to the formation of a codependent relationship may be based on several sources of information. An expert may have personal knowledge of the underlying facts or may obtain the requisite information by attending the trial and hearing the factual testimony. . . . If an expert has heard all of the relevant testimony, it is also within the court's discretion to permit a question predicated on that testimony. . . . Finally, an expert may obtain information at trial by having factual testimony summarized in the form of a hypothetical question at trial." (Citations omitted.) *State* v. *Carpenter*, supra, 275 Conn. 812 n.13.