******************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# STATE OF CONNECTICUT *v.* JUAN C. LOPEZ
## (AC 37912)

Lavine, Prescott and Harper, Js.

*Syllabus*

Convicted of the crimes of operating a motor vehicle while under the influence of alcohol in violation of statute (§ 14-227a [a] [1]) and operating a motor vehicle while his license was suspended, the defendant, who also was found guilty of being a third time offender, appealed to this court. The defendant had failed three field sobriety tests that were administered to him by a state police trooper, who had stopped the defendant's vehicle after observing it swerve on an interstate highway and estimating that the defendant was driving above the speed limit. The defendant was charged under subdivision (1) of § 14-227a (a), the behavioral subdivision, pursuant to which blood alcohol levels are generally excluded from evidence without a defendant's consent. On direct examination, the state's expert witness, a forensic toxicologist, testified in response to a set of hypothetical facts that an individual who performed in a certain way on the three sobriety tests must have had a blood alcohol concentration higher than the legal limit under § 14-227a and, thus, must have been intoxicated. On cross-examination, the defendant sought make the point that the expert's opinion was based on a hypothetical, and that the expert had not and could not express an opinion on the ultimate issue of whether the defendant was intoxicated and to what extent, but the court sustained the state's objections to those questions. On appeal, the defendant claimed, inter alia, that the trial court improperly restricted his cross-examination of the state's expert. *Held*:

1. The trial court abused its discretion in sustaining the state's objections to the defendant's attempts on cross-examination to question the state's expert witness regarding his lack of knowledge as to the defendant's blood alcohol content level: that court's ruling, which permitted the expert to testify on direct examination that an individual who performed in a certain way similar to that of the defendant on each of the field sobriety tests must have been under the influence of a central nervous system depressant such as alcohol and must have had a blood alcohol concentration higher than the legal limit, but precluded the defendant from questioning the expert to clarify that his opinion did not apply to this specific defendant, improperly allowed the state to open the door unfairly to the jury's consideration of blood alcohol levels when the defendant was charged solely under the behavioral subdivision of § 14-227a, without allowing the defendant an opportunity to defend against that critical evidence by explaining to the jury that the witness had not and could not express an opinion regarding the defendant's level of intoxication or whether he was intoxicated at all, and it was clear from the context of the expert's full testimony that the defendant did not ask him to opine on the ultimate issue of whether the defendant was intoxicated during the traffic stop; moreover, the defendant met his burden of demonstrating that the court's undue restriction on his cross-examination of the state's expert was harmful, as the jury may have misused the expert's opinion testimony on the topic of blood alcohol level to find the defendant guilty of operating a motor vehicle while under the influence of alcohol when he was charged only under the behavioral subdivision of § 14-227a (a), which precluded evidence of the defendant's blood alcohol content without his consent, of which there was no evidence in the record, and there was a substantial question regarding the scientific reliability of the expert's opinion evidence.

2. The defendant could not prevail on his claim that the trial court abused its discretion by admitting into evidence a DVD that contained video of the traffic stop, taken from the trooper's patrol car, which the defendant asserted was not sufficiently authenticated and was incomplete and altered: the defendant failed to preserve any claim that the admission of the DVD was improper on the ground that it was incomplete or potentially altered, and his unpreserved claim, which was evidentiary

and not constitutional in nature, was not reviewable pursuant to *State v. Golding* (213 Conn. 233), as no due process violation resulted from the admission of the DVD because that claim was abandoned when the defendant expressly disavowed, in his reply brief to this court, any claim for failure to preserve evidence, and the defendant's right to confrontation was not violated because he cross-examined the expert as to the segment of the video that was admitted, as well as about that portion of the traffic stop that was not captured on the DVD; moreover, the trooper's testimony that the video was a fair and accurate representation of the events was sufficient to authenticate the DVD, and the admission of the DVD did not constitute plain error, as the defendant presented no evidence that the video was anything other than an exact copy of the original footage and the issue of whether the DVD depicted the entire event concerned the weight of the evidence, not its admissibility.

(*One judge dissenting in part and concurring in part*)

Argued May 31—officially released October 31, 2017

*Procedural History*

Two part substitute information charging the defendant, in the first part, with the crimes of operating a motor vehicle while under the influence of intoxicating liquor and operating a motor vehicle with a suspended license, and, in the second part, with having previously been convicted of operating a motor vehicle while under the influence of intoxicating liquor, brought to the Superior Court in the judicial district of Fairfield, geographical area number two, where the first part of the information was tried to the jury before *Dennis, J.*; verdict of guilty; thereafter, the defendant was presented to the court on a plea of guilty to the second part of the information; judgment of guilty in accordance with the verdict and plea, from which the defendant appealed to this court. *Reversed; new trial.*

*James B. Streeto*, senior assistant public defender, with whom, on the brief, was *Ani A. Desilets*, certified legal intern, for the appellant (defendant).

*Ronald G. Weller*, senior assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, and *Mark R. Durso*, senior assistant state's attorney, for the appellee (state).

*Opinion*

PRESCOTT, J. The defendant, Juan C. Lopez, appeals from the judgment of conviction, rendered after a jury trial, of operating a motor vehicle while under the influence of alcohol in violation of General Statutes § 14-227a (a) (1) and operating a motor vehicle while his license was suspended in violation of General Statutes § 14-215. On appeal, the defendant claims, among other things, that the trial court improperly (1) restricted his cross-examination of the state's expert witness and (2) admitted an "incomplete and altered" dashboard camera video taken from the arresting officer's patrol car. With respect to the first claim, we agree with the defendant that the court improperly restricted his cross-examination of the expert witness and that that impropriety was harmful.[1] We thus reverse the judgment and remand the case for a new trial.

The following facts, which the jury reasonably could have found, and procedural history are relevant to this appeal. In the early morning of March 3, 2013, state police Trooper Colin Richter was driving northbound on Interstate 95 in Fairfield at a rate of speed of seventy-five miles per hour, patrolling a portion of the highway for motor vehicle violations. At approximately 1:50 a.m., he observed the defendant's vehicle in his rearview mirror "coming up on [him] very quick." The defendant's vehicle passed Richter and "began to swerve from the left lane to the center lane." At that point, having estimated that the defendant was driving above the speed limit, Richter activated his vehicle's red lights and conducted a motor vehicle stop. The defendant pulled over onto the right shoulder of the highway.

Richter approached the defendant's vehicle and, upon speaking with him, noticed that the defendant was slurring his speech and had glassy, bloodshot eyes. Richter also detected the odor of alcohol on the defendant's breath. When asked for his license and registration, the defendant could not produce a license. At that point, Richter asked the defendant where he had come from and whether he had been drinking beforehand. The defendant replied that he was coming from Stamford and had not been drinking.

After his initial contact with the defendant, Richter went back to his cruiser and looked up the defendant by his name and date of birth. Upon running the defendant's information in the Department of Motor Vehicles (department) database, Richter learned that the defendant's license had been suspended. Richter then called into dispatch, stating that he would be performing tests on the defendant to determine whether the defendant was intoxicated. He then administered the following three field sobriety tests:[2] (1) the horizontal gaze nystagmus test,[3] (2) the walk and turn test,[4] and (3) the one leg stand test.[5]

The defendant failed all three tests. On the basis of these results, Richter determined that the defendant could not safely operate a motor vehicle and placed him under arrest. Richter then transported the defendant to the police barracks, where he read the defendant his constitutional rights and asked if the defendant was injured or suffered from any medical conditions, to which the defendant replied in the negative.[6] Richter also asked the defendant, for a second time, whether he had had anything to drink the night of March 2, 2013, into the early morning of March 3, 2013. The defendant responded that he had had two mojitos between 7:30 and 9:30 p.m. at a restaurant in New York City, and then had stopped at his grandmother's residence in Stamford on his way home to Bridgeport. After this admission, Richter asked the defendant to submit to a Breathalyzer test to measure his blood alcohol content, but he refused.

On November 17, 2014, a jury trial commenced against the defendant. The state called three witnesses to testify on its behalf: Richter; Dr. Robert H. Powers, a forensic toxicologist; and department analyst Brian Clarke. After the state rested, the defendant did not present any additional evidence. Subsequently, the defendant was found guilty of operating a motor vehicle while under the influence of alcohol in violation of § 14-227a (a) (1) and operating a motor vehicle while his license was suspended in violation of § 14-215. Thereafter, he pleaded guilty to a part B information charging him as a third time offender pursuant to § 14-227a (g) (3).[7]

The court sentenced the defendant to three years of incarceration, execution suspended after two years, followed by three years of probation. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant claims on appeal that the trial court unduly restricted his cross-examination of Dr. Powers on the subject of his opinion testimony regarding the blood alcohol level of a person exhibiting the same behaviors as the state alleged the defendant exhibited in this case. More specifically, the defendant argues that once Dr. Powers testified on direct examination that an individual who performed in a certain way on each of the field sobriety tests had an extrapolated blood alcohol content of 0.12 or higher, the court should not have foreclosed the defendant from later cross-examining him about this central, relevant issue. We agree with the defendant that the court's ruling was an abuse of discretion and conclude that the impropriety was not harmless.

The following facts are relevant to the defendant's claim. At trial, the state's witness, Dr. Powers, was

permitted to testify as an expert in the field of forensic toxicology without objection. He testified that nystagmus exhibited during a horizontal gaze nystagmus test is caused by the presence of a central nervous system depressant, such as alcohol, in the operator's system. The state then asked Dr. Powers several hypothetical questions comprised of facts mirroring those present in the case.

In its first hypothetical, the state described a man who exhibited an odor of alcohol on his breath, bloodshot/glassy eyes, and who failed the horizontal gaze nystagmus test by exhibiting the same signs the defendant had—a lack of smooth pursuit in each eye, a distinct and sustained nystagmus at maximum deviation, and the onset of nystagmus prior to forty-five degrees. The second hypothetical went on to posit that the man described in the first hypothetical had also failed the walk and turn test in the same way the defendant had. The third hypothetical described the same man failing the one leg stand test in the way the defendant had.

After each hypothetical, the state asked Dr. Powers whether he could opine to a reasonable degree of scientific certainty as to whether the man described was under the influence of a central nervous system depressant such as alcohol. In each instance, Dr. Powers responded that he could and answered in the affirmative that he would expect the individual in question to have been affected by a central nervous system active agent.

The state then asked Dr. Powers what he would expect the hypothetical man's blood alcohol level to be on the basis of the behavior he exhibited and his performance on each of the three field sobriety tests. The defendant objected to the question on the ground that there was not an appropriate foundation laid as to "how much alcohol" was ingested. The court overruled his objection. Dr. Powers then responded that he would be looking for "blood alcohol concentration of a 0.12 or higher. How much higher, that's very hard to say. But I'd be looking for at least a 0.12. Below a 0.12, we tend not to see complete failures on the standardized field sobriety tests. . . . [O]ur research actually [that] we've done recently shows that when basically all the clues in the . . . standardized field sobriety tests are being generated, that individuals tend to have a concentration above 0.12 or 0.15 or even higher. . . . [T]he ability to operate motor vehicles diminishes with increased blood alcohol concentration, or with an increase in the concentration of any central nervous system depressant."

Subsequently, during cross-examination, the following colloquy took place between Dr. Powers, defense counsel, the prosecutor, and the court:

"[Defense Counsel]: So, if you recall the question that [the prosecutor] had asked you regarding a—let me

withdraw that question. If a person has driven from Stamford, Connecticut, to Fairfield, Connecticut, was not involved in any accidents, was pulled over by a trooper, the trooper only saw the car swerve once, the operator then pulled over three lanes from the left lane to the middle lane to the right lane to the shoulder, parked the car properly, did not hit any other objects, did not hit a guardrail; and would those set of facts change your opinion as to the level of intoxication somebody may have?

"[Dr. Powers]: Probably not; but I recognize that that level of control and behavior seems inconsistent with the level of alcohol that I opined on earlier, assuming this is all referring to the same individual.

"[Defense Counsel]: Okay. So, it is—so, assume that it's the same individual and—but you just testified that it doesn't —it doesn't indicate the person that you just opined to. So, would that—so, would that level of intoxication be lower, then, if they had that much control over a vehicle?

"[Dr. Powers]: I'm just saying that—that the—that the behavior you described seems inconsistent to me with the behavior described in the performance of the standardized field sobriety tests. And I heard it as weaving. But nevertheless, I was responding to your question.

"[Defense Counsel]: Okay. And would that change your answer as to the level of intoxication if the person was able to do that much?

"[Dr. Powers]: No, I don't think so. It does make me think about it, but I don't—I think I would stick with what I've said so far based on the descriptions of the performance on the field testing as described.

"[Defense Counsel]: But it could possibly change your opinion?

"[Dr. Powers]: I think I just said it would not.

"[Defense Counsel]: Right. But you don't want—

"[Dr. Powers]: It certainly is—

"[Defense Counsel]: —you don't want to change your opinion.

"[Dr. Powers]: I'm sorry?

"[Defense Counsel]: You don't want to change your opinion.

"[The Prosecutor]: Objection; that's argumentative.

"The Court: The objection is sustained. You may disregard the question.

"[Defense Counsel]: Okay. . . . And were you on [Interstate] 95 on March 3, 2013, at 1:52 a.m.?

"[Dr. Powers]: I can say no.

"[Defense Counsel]: And so you were not present when any field sobriety tests were administered to [the defendant]?

"[Dr. Powers]: Correct. I was not.

"[Defense Counsel]: And with any level—with any degree of certainty with you not being there, do you—

"[Dr. Powers]: I'm sorry?

"[Defense Counsel]: Without—with any degree of medical certainty with you not being present at this scene on [Interstate] 95 on March 3, 2013, at 1:52 a.m., you—you do not know what [*the defendant's*] level of intoxication was.

"[The Prosecutor]: I'm going to object. That calls for a legal conclusion or a conclusion at this point. That's the jury's responsibility.

"The Court: *The objection is sustained.*

"[Defense Counsel]: Okay. . . . As you sit here today, do you know if [*the defendant*] was intoxicated that day?

"[The Prosecutor]: Objection.

"The Court: *The objection is sustained.*

"[Defense Counsel]: I have no further questions." (Emphasis added.)

Turning now to the governing legal principles and the standard of review, we note that "[t]he sixth amendment to the [United States] constitution guarantees the right of an accused in a criminal prosecution to confront the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . . Compliance with the constitutionally guaranteed right to cross-examination requires that the defendant be allowed to present the jury with facts from which it could appropriately draw inferences relating to the witness' reliability. . . . However, [t]he [c]onfrontation [c]lause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. . . . Thus, [t]he confrontation clause does not . . . suspend the rules of evidence to give the defendant the right to engage in unrestricted cross-examination. . . .

"Although [t]he general rule is that restrictions on the scope of cross-examination are within the sound discretion of the trial [court] . . . this discretion comes into play only after the defendant has been permitted cross-examination sufficient to satisfy the sixth amendment." (Internal quotation marks omitted.) *State* v. *Leconte*, 320 Conn. 500, 510–11, 131 A.3d 1132 (2016). If that constitutional standard has been satisfied, then "[t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the

court's discretion. . . . [That is to say] [t]he court's decision is not to be disturbed unless [its] discretion has been abused, or the error is clear and involves a misconception of the law." (Internal quotation marks omitted.) *State* v. *Favoccia*, 306 Conn. 770, 785–86, 51 A.3d 1002 (2012).

With these principles in mind, we turn to the present case. First, we note that "[i]t is well established that this court has a basic judicial duty to avoid deciding a constitutional issue if a nonconstitutional ground exists that will dispose of the case." (Internal quotation marks omitted.) *State* v. *Brown*, 309 Conn. 469, 478–79 n.11, 72 A.3d 48 (2013). Because the present appeal properly may be resolved on evidentiary grounds, we need not address the defendant's argument that the restrictions that the court placed on defense counsel's cross-examination of Dr. Powers did not comply with the minimum constitutional standards required by the sixth amendment.

We thus consider whether the court abused its discretion in sustaining the state's objection to defense counsel's question to Dr. Powers regarding his lack of knowledge as to the defendant's blood alcohol level on the ground that it sought to elicit his opinion on a legal conclusion belonging to the jury. The defendant contends that it was an abuse of discretion, arguing that once the state improperly asked Dr. Powers on direct examination to draw a legal conclusion for the jury, i.e., that the defendant was "per se" intoxicated with an elevated blood alcohol content on the basis of his performance on the field sobriety tests,[8] the defendant should not have been foreclosed from then questioning Dr. Powers to make clear that his opinion regarding the individual's extrapolated blood alcohol content did not, in fact, apply to this specific defendant. We agree.

Our Supreme Court has held that "[g]enerally, a party who delves into a particular subject during the examination of a witness cannot object if the opposing party later questions the witness on the same subject. . . . The party who initiates discussion on the issue is said to have opened the door to rebuttal by the opposing party. Even though the rebuttal evidence would ordinarily be inadmissible on other grounds, the court may, in its discretion, allow it where the party initiating inquiry has made unfair use of the evidence. . . . The doctrine of opening the door cannot, of course, be subverted into a rule for injection of prejudice. . . . The trial court must carefully consider whether the circumstances of the case warrant further inquiry into the subject matter, and should permit it only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence." (Internal quotation marks omitted.) *State* v. *Brown*, supra, 309 Conn. 479. In addition, § 7-3 (a) of the Con-

necticut Code of Evidence provides in relevant part that "[t]estimony in the form of an opinion is inadmissible if it embraces an ultimate issue to be decided by the trier of fact . . . ."

In reviewing the transcript of Dr. Powers' cross-examination in the present case, we note that the defendant did not ask the witness to opine on an ultimate issue in the case when he asked, "you do not know what [the defendant's] level of intoxication was . . . ." Although the state argues on appeal that the defendant was asking Dr. Powers "to opine on whether the defendant himself specifically was intoxicated that evening" in violation of § 7-3 (a) of the Connecticut Code of Evidence, if viewed in the context of Dr. Powers' full testimony, it is clear that that was not the intent of the question posed.

Although defense counsel subsequently attempted to rephrase this question by asking, "do you know if [the defendant] was intoxicated that day?," this time omitting any reference to "the level" of his intoxication, we are still unconvinced that this omission indicates that the defendant was asking him to opine on the ultimate issue of the defendant's intoxication generally, as opposed to making the point that Dr. Powers did not know his specific blood alcohol level. In reviewing this specific colloquy in the transcript, defense counsel used the phrase "level of intoxication" in four questions immediately prior to the one at issue and asked Dr. Powers whether the level of intoxication of a person exhibiting certain behaviors would be *lower* than the level on which he previously opined on direct examination—0.12 or higher—all of which indicate that he was referring to blood alcohol level specifically during this entire line of questioning and not intoxication generally.

Rather, the defendant, through his questions, was pointing out to the jury that the expert witness had not offered any opinion on this *particular* defendant's blood alcohol content when he testified on direct examination that a person who performed field sobriety tests in a certain manner must have a "blood alcohol concentration of a 0.12 or higher" and, thus, must be intoxicated. In other words, the defendant was attempting to make the significant point that the expert's opinion was based on a hypothetical set of facts and not on any chemical analysis of the defendant's blood alcohol content or even upon his own personal observation of the defendant. Indeed, viewed in this light, the defendant was attempting to make clear to the jury that the witness had not and could not express an opinion on the ultimate issue in this case: whether the defendant was intoxicated and to what extent.[9]

Accordingly, we are left with a situation in which the court improperly allowed the state to open the door unfairly to the jury's consideration of blood alcohol levels in a case in which the defendant was charged

solely under the "behavioral" subdivision of § 14-227a, as we will discuss more fully in our harmlessness analysis, without also allowing the defendant an opportunity to defend against that critical evidence by explaining to the jury that the witness had not and could not express an opinion regarding the defendant's level of intoxication or whether he was intoxicated at all. By sustaining the state's objections to this question, the court's ruling allowed the state to "have it both ways": its expert was permitted to testify that a person who performed on the field sobriety test in the same manner that the state claimed the defendant did must have had a blood alcohol level of at least 0.12, but the defendant could not make clear that the expert had not opined about the blood alcohol level of this specific defendant. For these reasons, the court's evidentiary ruling was an abuse of discretion.

Having determined that the court's ruling was an abuse of discretion, we must next consider whether that impropriety was nonetheless harmless. "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [A] nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict. . . . [O]ur determination [of whether] the defendant was harmed by the trial court's . . . [evidentiary ruling] is guided by the various factors that we have articulated as relevant [to] the inquiry of evidentiary harmlessness . . . such as the importance of the . . . testimony in the [state's] case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony . . . on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the [state's] case. . . . *Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial.*" (Emphasis added; internal quotation marks omitted.) *State* v. *Rodriguez*, 311 Conn. 80, 89, 83 A.3d 595 (2014). After reviewing these factors in the present case, we are convinced that the defendant has met his burden of demonstrating that the court's undue restriction on his cross-examination of Dr. Powers was harmful.[10]

Significantly, in considering the impact on the trier of fact of Dr. Powers' direct examination testimony combined with the court's limitation on his cross-examination testimony, we have serious concerns that the jury may have misused the witness' opinion testimony on the topic of blood alcohol level to improperly find the defendant guilty of operating while under the influence. More specifically, because the legislature has evinced a clear intent that a defendant's blood alcohol content should not be admitted without the defendant's consent in a prosecution brought pursuant to § 14-227a (a) (1), and because there is a substantial question regarding

the scientific reliability of this opinion evidence, we cannot conclude that the court's ruling was harmless.

First, we note that § 14-227a (a) provides in relevant part: "No person shall operate a motor vehicle while under the influence of intoxicating liquor or any drug or both. A person commits the offense of operating a motor vehicle while under the influence of intoxicating liquor or any drug or both if such person operates a motor vehicle (1) while under the influence of intoxicating liquor or any drug or both, or (2) while such person has an elevated blood alcohol content. For the purposes of this section, 'elevated blood alcohol content' means a ratio of alcohol in the blood of such person that is eight-hundredths of one per cent or more of alcohol, by weight . . . ." Moreover, subsection (c) of § 14-227a provides that "[i]n any prosecution for a violation of subdivision (1) of subsection (a) of this section, reliable evidence respecting the amount of alcohol in the defendant's blood or urine at the time of the alleged offense, as shown by a chemical analysis of the defendant's blood, breath or urine, otherwise admissible under subsection (b)[11] of this section, shall be admissible *only at the request of the defendant*." (Emphasis added; footnote added.)

As previously mentioned herein, this court has "described General Statutes § 14-227a (a) (1) as the 'behavioral' subdivision and § [14-227a] (a) (2) as the 'per se' subdivision" of the offense of operating under the influence. *State* v. *Longo*, supra, 106 Conn. App. 705 n.5. "The legislative history reflects that the two subdivisions of § 14-227a (a) describe alternative means for committing the same offense of illegally operating a motor vehicle while under the influence of intoxicating liquor or drugs. In other words, the two subdivisions provide for different methods of proof of the same offense and, significantly, the legislature clearly indicated that an individual could not be punished under both subdivisions of the statute without violating double jeopardy." *State* v. *Re*, 111 Conn. App. 466, 472–73, 959 A.2d 1044 (2008).

In the present case, the defendant was charged only under the behavioral subdivision of § 14-227a (a). In a prosecution under that subdivision, the legislature has evinced a clear intent that a defendant's blood alcohol content should *not* be admitted absent the defendant's consent, of which there is no evidence in the record of the present case. See General Statutes § 14-227a (c). Despite this, the state elicited testimony from Dr. Powers concerning the blood alcohol level—0.12 or higher—of an individual who exhibited the same behaviors during the horizontal gaze nystagmus, walk and turn, and one leg stand tests as the state alleged the defendant exhibited on March 3, 2013, without allowing the defendant to make clear to the jury that Dr. Powers was not opining on the blood alcohol level of this *spe-*

*cific* defendant.[12]

Although we recognize that the language of the statute refers to blood alcohol content "as shown by a chemical analysis of the defendant's blood, breath or urine"; General Statutes § 14-227a (c); and that the blood alcohol content evidence in this case was not derived from such a chemical analysis, we do not believe that, at the time the legislature passed the statute, it contemplated that there would be any other way to demonstrate the concentration of alcohol in someone's blood except by chemical analysis. Thus, as a matter of statutory interpretation, it would lead to absurd and unworkable results to interpret the statute to permit evidence of the defendant's blood alcohol content derived from a less reliable, extrapolated analysis, such as the one made here, while prohibiting blood alcohol content evidence derived from a more reliable procedure, i.e., chemical testing of the defendant's blood, breath, or urine. Indeed, from the plain language of § 14-227a, it is reasonably apparent that the legislature intended blood alcohol content evidence to be based solely on chemical testing and its admissibility to be contingent on the satisfaction of strict statutory criteria, e.g., the performance of multiple chemical tests administered by qualified law enforcement personnel within two hours of the defendant's operation of the vehicle. See General Statutes § 14-227a (b). Permitting evidence in this behavioral prosecution case of a blood alcohol content derived from a subjective interpretation of the defendant's performance on standard field sobriety tests, without using any of the approved methods and procedures, does great violence to the intent of the statute.[13]

This leads to the second reason that the court's evidentiary ruling was harmful in its potential impact on the jury: there is a substantial question regarding the scientific reliability of this opinion evidence, and it has been excluded by the large majority of courts that have considered it. See, e.g., *State* v. *Shadden*, 290 Kan. 803, 820–25, 235 P.3d 436 (2010); *Wilson* v. *State*, 124 Md. App. 543, 553–59, 723 A.2d 494 (1999); *State* v. *Fisken*, 138 Or. App. 396, 398–99, 909 P.2d 206 (1996). Although we need not determine, for purposes of deciding this claim, whether the opinion testimony should have been excluded pursuant to *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997) (en banc), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), the significant questions regarding its reliability exacerbate the conflict between our statutory provision generally excluding blood alcohol levels in behavioral cases and the court's admission of it in this case without an opportunity for the defendant, at the very least, to limit the scope of the opinion on cross-examination by emphasizing that the expert witness had not and could not express an opinion regarding the defendant's level of intoxication or if he was intoxicated at all.

As the Arizona Supreme Court noted in construing that state's similar statutory scheme: "[O]ur state legislature has specified that blood, breath, and urine tests are the only methods for measuring, or quantifying, [blood alcohol content]. A.R.S. § 28-692 (G), (H) . . . *People* v. *Dakuras*, 172 Ill. App. 3d 865, [868–70, 527 N.E.2d 163] (because the [horizontal gaze nystagmus] test does not determine [blood alcohol content] by analysis of specified bodily substances, the results are not admissible to prove [blood alcohol content] in any prosecution under [the driving while under the influence] statute) [leave to appeal denied, 123 Ill. 2d 561, 535 N.E.2d 405 (1988)]; *State* v. *Barker*, [179 W. Va. 194, 198, 366 S.E.2d 642 (1988)] (assuming [horizontal gaze nystagmus] test was found reliable, evidence would be admissible only as evidence of driving under the influence, but not to estimate[blood alcohol content], as state legislature has not recognized [horizontal gaze nystagmus] test as an appropriate method for measuring [blood alcohol content]). Therefore, [blood alcohol content], under § [28]-692 is to be determined deductively from analysis of bodily fluids, not inductively from observation of involuntary bodily movements. . . . Within the limits of due process, it is the legislature's role to determine which tests may be used to measure [blood alcohol content]. Where the legislature has prescribed only specific tests for such measurements, it is not our province to add others.

"Moreover, the [horizontal gaze nystagmus] test does not conform to the requirements for determining [blood alcohol content] stated in the Arizona implied consent law, which does not include implied consent to take a [horizontal gaze nystagmus] test for[blood alcohol content]. A refusal to take one of the prescribed tests leads to automatic suspension of the license or permit for a period of twelve months . . . and can be brought out in any civil or criminal action arising from the incident . . . . In recognition of the constitutional limitations of implied consent laws, tests pursuant to the law are strictly governed by statutes for both testing requirements and Department of Health Services . . . qualifications. An important part of the testing requirements is the defendant's right to independently check the test results. . . . The [horizontal gaze nystagmus] test, although it carries a scientific patina, is clearly unchallengeable by independent means, other than by cross-examining the officer who administered the test. We do not believe cross-examination of the officer is a sufficient check when compared to the standards set forth for tests specifically accepted under [driving under the influence] statute provisions for implied consent and for establishing [blood alcohol content]." (Citations omitted; internal quotation marks omitted.) *State ex rel. Hamilton* v. *City Court of Mesa*, 165 Ariz., 514, 517, 799 P.2d 855 (1990).

Accordingly, we find it significant, for purposes of determining harmfulness, that the horizontal gaze nystagmus test and other field sobriety tests from which Dr. Powers derived his blood alcohol content opinion testimony are not outlined in subsection (b) of § 14-227a alongside the other strict chemical analysis requirements for per se prosecutions in which blood alcohol content evidence *is* admissible, had that been the case here. Given the potential unreliability of blood alcohol content evidence that is based on this method, and given that "[w]e cannot ignore the heightened credence juries tend to give scientific evidence"; (internal quotation marks omitted) *Wilson* v. *State*, supra, 124 Md. App. 559; the risk that this type of evidence might have had an improper impact on the jury and on the result of the trial, without the defendant's being permitted to engage in the scope of unfettered cross-examination to which he was entitled, is too great.

Ultimately, our consideration of both of these factors leads us to conclude that the defendant met his burden of proving that the court's restriction of his cross-examination of Dr. Powers on the issue of the defendant's blood alcohol content was harmful. Accordingly, we reverse the judgment on this ground and remand the case for a new trial.

## II

Although we have concluded in part I of this opinion that the judgment must be reversed and the case remanded for a new trial, we address the defendant's claim that the court abused its discretion by admitting into evidence a DVD containing an "incomplete and altered" dashboard camera video taken from Richter's patrol car because that issue is likely to arise again on remand. See *State* v. *Chyung*, 325 Conn. 236, 260 n.21, 157 A.3d 628 (2017) (addressing issue likely to arise on remand). The plaintiff claims that the court abused its discretion by admitting the DVD because the state failed to authenticate it properly.[14] Specifically, the defendant contends that, as an altered exhibit, the DVD was subject to the "heightened standard" for authentication articulated in *State* v. *Swinton*, 268 Conn. 781, 847 A.2d 921 (2004), and *State* v. *Melendez*, 291 Conn. 693, 970 A.2d 64 (2009).[15] He also claims that the state failed to demonstrate a chain of custody for the DVD. We are not persuaded by the defendant's claims.

The following additional facts are relevant to this claim. A DVD of the dashboard camera footage from Richter's patrol car was admitted into evidence at trial, depicting a portion of the traffic stop and the transportation of the defendant following his arrest. The video footage on the DVD begins during administration of the walk and turn test. Richter's interactions with the defendant from the time that he activated his emergency lights, including the administration of the horizontal

gaze nystagmus test, are not depicted in the video.

Before that DVD was admitted and published to the jury, however, Richter testified on direct examination that the entire stop of the defendant, including the horizontal gaze nystagmus test, should have been recorded by his dashboard camera system because the system begins recording whenever he activates his emergency lights.[16] He also testified that on the morning of his testimony, he had viewed the DVD with the prosecutor. The state then sought to admit the DVD into evidence. Thereafter, defense counsel conducted voir dire of Richter. During this voir dire, Richter testified that his dashboard camera system records onto a VHS videotape, which he then submits to the trooper in charge of evidence at the troop G barracks. Richter was unable to explain how the video was transferred to a DVD, but stated that he and the defendant were depicted in the video.

The defendant objected to the admission of the DVD, stating, "[Richter] didn't make this actual DVD. I mean, he isn't able to identify how it got here or how it gets here." The court asked Richter whether the DVD, as viewed by him earlier that morning, was a fair and accurate representation of the events that occurred on the morning in question, to which Richter responded in the affirmative. The court then overruled the objection and admitted the DVD as a full exhibit.

After the court admitted the DVD as a full exhibit and its contents were published to the jury, it became apparent that the video on the DVD did not begin to depict the defendant's traffic stop until the defendant was taking the *second* field sobriety test he was given, the walk and turn test. Richter again testified that the dashboard camera in his cruiser is activated when he engages his emergency lights, and, when asked, could not explain why the DVD did not include the entire encounter.

It is significant that the defendant did not renew his objection to the admission of the DVD when these facts were revealed, nor did he specifically argue that the state had violated his rights by failing to produce a video of the entire traffic stop. Consequently, although the defendant attempts to reframe, on appeal, his original objection to the admission of the DVD as taking issue with both the fact that only portions of Richter's full traffic stop, the entirety of which was never shown to the defendant, were contained in the video presented to the jury *and* the lack of proper authentication of the video, this is not an accurate retelling of the events at trial. Rather, a review of the trial transcripts makes it clear that the defendant failed to preserve any claim that the court abused its discretion in admitting the DVD on the ground that it was incomplete or potentially altered and, thus, the original evidence had not been disclosed to him. See *State* v. *Rivera*, 169 Conn. App.

343, 366, 150 A.3d 244 (2016) ("In order to preserve an evidentiary ruling for review, trial counsel must object properly. . . . In objecting to evidence, counsel must properly articulate the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling." [Internal quotation marks omitted.]), cert. denied, 324 Conn. 905, 152 A.3d 544 (2017).

The defendant does argue on appeal, however, that in the event his claim that the DVD was inadmissible because the state failed to produce a video of the entire traffic stop was not properly preserved at trial, the claim is nevertheless reviewable under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). "Under *Golding*, a defendant may prevail on an unpreserved claim only if the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Baccala*, 326 Conn. 232, 269–70 n.11, 163 A.3d 1 (2017), *petition for cert. docketed* (U.S. September 28, 2017).

With regard to the second prong of *Golding*, the defendant appears to argue in his brief that both his due process rights under the fifth and fourteenth amendments to the United States constitution, and his confrontation clause rights under the sixth amendment were violated by the admission of the DVD. First, we summarily reject his argument that his due process rights were violated by the court's admission of the purportedly incomplete video because that claim was abandoned when the defendant expressly disavowed, in his reply brief to this court, any claim for failure to preserve evidence pursuant to *State* v. *Morales*, 232 Conn. 707, 657 A.2d 585 (1995). Second, we conclude that the defendant's confrontation clause rights under the sixth amendment were not violated by the court's admission of the DVD because the defendant was able to cross-examine Richter, confronting him with the segment of the video that was admitted. Importantly, the record shows that the defendant did, in fact, question Richter regarding the portion of the traffic stop that was *not* captured on the video on the DVD. Consequently, he was able to confront Richter using the video that was admitted into evidence. Thus, his claim is merely of an evidentiary nature and does not rise to the level of constitutional magnitude required by the second prong of *Golding*. See *State* v. *Smith*, 110 Conn. App. 70, 86, 954 A.2d 202 ("[r]obing garden variety claims

[of an evidentiary nature] in the majestic garb of constitutional claims does not make such claims constitutional in nature" [internal quotation marks omitted]), cert. denied, 289 Conn. 954, 961 A.2d 422 (2008). Therefore, the claim is not reviewable pursuant to *Golding*.

The defendant also invokes the plain error rule in an attempt to prevail on his claim that the DVD was inadmissible because the state failed to produce a video of the entire traffic stop. See Practice Book § 60-5. "An appellate court addressing a claim of plain error first must determine if the error is indeed plain in the sense that it is patent [or] readily discernable on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . Although a complete record and an obvious error are prerequisites for plain error review, they are not, of themselves, sufficient for its application. . . . [I]n addition to examining the patent nature of the error, the reviewing court must examine that error for the grievousness of its consequences in order to determine whether reversal under the plain error doctrine is appropriate. A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice." (Internal quotation marks omitted.) *State* v. *Sanchez*, 308 Conn. 64, 77, 60 A.3d 271 (2013).

We are not persuaded that there was any error in the admission of the DVD, much less plain error. See *State* v. *Pierce*, 269 Conn. 442, 453, 849 A.2d 375 (2004) ("the plain error doctrine should not be applied in order to review a ruling that is not arguably incorrect in the first place"). Whether the DVD depicted the entire event or not goes to the weight of the evidence, not its admissibility. See, e.g., *Williams Ground Services, Inc.* v. *Jordan*, 174 Conn. App. 247, 259, 166 A.3d 791 (2017) (stating completeness of business records goes to weight not admissibility). Additionally, the defendant has not presented evidence that the video contained on the DVD was anything other than an exact copy of the original footage.

As previously discussed in our analysis of whether the defendant's claim is entitled to *Golding* review, the defendant appears to argue that the court's ruling was plain error because he was clearly entitled to production of the video of the entire traffic stop; without it, he argues, one is left to speculate as to whether the entire video of the traffic stop was saved or, alternatively, was simply not provided to him in discovery as is required by *State* v. *Morales*, supra, 232 Conn. 707. We reject this argument on the ground that the defendant has expressly disavowed any such claim on appeal. More specifically, the defendant clarified in his reply brief to this court that he is not arguing that the state improperly lost or destroyed evidence and that he thus was deprived of due process pursuant to *Morales*. The defendant accordingly has failed to persuade us that a

manifest injustice has occurred. Consequently, he cannot prevail under the plain error doctrine.

We then turn to the only preserved claim that the defendant advances on appeal, which is that the DVD was not sufficiently authenticated and, thus, should not have been admitted. "We review the trial court's decision to admit evidence, if premised on a correct view of the law . . . for an abuse of discretion." *State* v. *Saucier*, 283 Conn. 207, 218, 926 A.2d 633 (2007); see also *Nieves* v. *Commissioner of Correction*, 169 Conn. App. 587, 597 n.12, 152 A.3d 570 (2016) (because "[t]he trial court has broad discretion in ruling on the admissibility . . . of evidence . . . [t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion" [internal quotation marks omitted]), cert. denied, 324 Conn. 915, 153 A.3d 1288 (2017). The abuse of discretion standard requires that "every reasonable presumption . . . be given in favor of the trial court's rulings on evidentiary matters." (Internal quotation marks omitted.) *State* v. *Gauthier*, 140 Conn. App. 69, 79–80, 57 A.3d 849, cert. denied, 308 Conn. 907, 61 A.3d 1097 (2013).

"The requirement of authentication as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the offered evidence is what its proponent claims it to be." Conn. Code Evid. § 9-1 (a); see also *State* v. *Garcia*, 299 Conn. 39, 57, 7 A.3d 355 (2010). A DVD of dashboard camera video is "subject to the same foundational requirements for admission as any other demonstrative evidence. Such evidence should be admitted only if it is a fair and accurate representation of that which it attempts to portray." (Internal quotation marks omitted.) *State* v. *Melendez*, supra, 291 Conn. 710.

In the present case, the DVD was purported to be a video of the traffic stop of the defendant on March 3, 2013. Richter testified that he and the defendant were in the video and that it was a fair and accurate representation of the events of that morning. This evidence is sufficient to establish that the DVD is what the state claimed it to be. Richter's testimony was sufficient to authenticate the DVD, and the defendant cannot prevail on his claim that the video was improperly admitted.

The judgment is reversed and the case is remanded for a new trial.

In this opinion LAVINE, J., concurred.

[1] The defendant also claims that the trial court improperly allowed an expert witness to opine about the defendant's blood alcohol content without a proper foundation for that opinion, in the absence of any chemical testing, and without first conducting a hearing pursuant to *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997) (en banc), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998). Because we reverse the court's judgment on the ground that it improperly restricted the defendant's cross-examination of the expert witness, we need not reach the merits of this claim, except as it is discussed in the context of our analysis of the first claim.

[2] Richter was properly trained to administer the tests used to determine whether the defendant was intoxicated.

[3] "The horizontal gaze nystagmus test measures the extent to which a person's eyes jerk as they follow an object moving from one side of the person's field of vision to the other. The test is premised on the understanding that, whereas everyone's eyes exhibit some jerking while turning to the side, when the subject is intoxicated the onset of the jerking occurs after fewer degrees of turning, and the jerking at more extreme angles becomes more distinct." (Internal quotation marks omitted.) *State* v. *Popeleski*, 291 Conn. 769, 770 n.3, 970 A.2d 108 (2009).

[4] "The walk and turn test requires the subject to walk heel to toe along a straight line for nine paces, pivot, and then walk back heel to toe along the line for another nine paces. The subject is required to count each pace aloud from one to nine." (Internal quotation marks omitted.) *State* v. *Popeleski*, 291 Conn. 769, 771 n.4, 970 A.2d 108 (2009).

[5] "The one leg stand test requires the subject to stand on one leg with the other leg extended in the air for [thirty] seconds, while counting aloud from [one] to [thirty]." (Internal quotation marks omitted.) *State* v. *Popeleski*, 291 Conn. 769, 771 n.5, 970 A.2d 108 (2009).

[6] Richter previously had asked the defendant this same question before he administered each of the three field sobriety tests.

[7] General Statutes § 14-227a (g) provides in relevant part: "Any person who violates any provision of subsection (a) of this section shall . . . (3) for conviction of a third and subsequent violation within ten years after a prior conviction for the same offense, (A) be fined not less than two thousand dollars or more than eight thousand dollars, (B) be imprisoned not more than three years, one year of which may not be suspended or reduced in any manner, and sentenced to a period of probation requiring as a condition of such probation that such person . . . [p]erform one hundred hours of community service, as defined in section 14-227e . . . and (C) have such person's motor vehicle operator's license or nonresident operating privilege permanently revoked upon such third offense . . . ."

We note that although § 14-227a has been amended since the events at issue here, those amendments are not relevant to this appeal. For convenience, we refer in this opinion to the current revision of § 14-227a.

[8] "We previously have described General Statutes § 14-227a (a) (1) as the 'behavioral' subdivision and § [14-227a] (a) (2) as the 'per se' subdivision" of the offense of operating under the influence. *State* v. *Longo*, 106 Conn. App. 701, 705 n.5, 943 A.2d 488 (2008). This statute will be discussed more fully in this part of the opinion.

[9] The dissent argues that the defendant's questions must be construed as an attempt to get the state's expert to opine on an ultimate issue in the case, namely, whether the defendant was intoxicated. We are not persuaded by this reading of the transcript because it seems most unlikely that counsel for the defendant would invite the state's witness, who already had suggested on direct examination that the defendant was intoxicated, to opine directly on the ultimate issue in the case. In our view, defense counsel was attempting to do precisely the opposite, i.e., make clear to the jury that the expert witness had not and could not opine on the ultimate issue in the case.

[10] In attempting to rebut our conclusion, the dissent implies that the *quantity* of defense counsel's overall cross-examination of the state's expert suggests harmlessness. In our view, however, the court's restriction on cross-examination impacted the *quality* of the cross-examination, and it is that impact that is significant here.

[11] General Statutes § 14-227a (b) provides: "Except as provided in subsection (c) of this section, in any criminal prosecution for violation of subsection (a) of this section, evidence respecting the amount of alcohol or drug in the defendant's blood or urine at the time of the alleged offense, as shown by a chemical analysis of the defendant's breath, blood or urine shall be admissible and competent provided: (1) The defendant was afforded a reasonable opportunity to telephone an attorney prior to the performance of the test and consented to the taking of the test upon which such analysis is made; (2) a true copy of the report of the test result was mailed to or personally delivered to the defendant within twenty-four hours or by the end of the next regular business day, after such result was known, whichever is later; (3) the test was performed by or at the direction of a police officer according to methods and with equipment approved by the Department of Emergency Services and Public Protection and was performed in accordance with the regulations adopted under subsection (d) of this section; (4) the device used for such test was checked for accuracy in accordance with the

regulations adopted under subsection (d) of this section; (5) an additional chemical test of the same type was performed at least ten minutes after the initial test was performed or, if requested by the police officer for reasonable cause, an additional chemical test of a different type was performed to detect the presence of a drug or drugs other than or in addition to alcohol, provided the results of the initial test shall not be inadmissible under this subsection if reasonable efforts were made to have such additional test performed in accordance with the conditions set forth in this subsection and such additional test was not performed or was not performed within a reasonable time, or the results of such additional test are not admissible for failure to meet a condition set forth in this subsection; and (6) evidence is presented that the test was commenced within two hours of operation. In any prosecution under this section it shall be a rebuttable presumption that the results of such chemical analysis establish the ratio of alcohol in the blood of the defendant at the time of the alleged offense, except that if the results of the additional test indicate that the ratio of alcohol in the blood of such defendant is ten-hundredths of one per cent or less of alcohol, by weight, and is higher than the results of the first test, evidence shall be presented that demonstrates that the test results and the analysis thereof accurately indicate the blood alcohol content at the time of the alleged offense."

[12] Moreover, because the specific blood alcohol level that constitutes per se intoxication in this state for purposes of operating a motor vehicle under the influence is likely within the common knowledge of most jurors, Dr. Powers' opinion that an individual who behaved in a manner similar to the defendant had a blood alcohol content over that per se number might provide the jury with an attractive shortcut in determining the defendant's guilt, despite the fact that he solely was charged under the behavioral subdivision of § 14-227a (a), and, thus, the state must prove the offense in that specific manner.

[13] The dissent claims that our analysis rests in part on an implicit assumption that the jury disobeyed or ignored the court's legal instructions, and asserts that the court expressly directed the jury that it could rely on "only" behavioral evidence in determining whether the defendant was intoxicated. Nowhere in the court's instructions, however, did the court place any limitation on what duly admitted trial evidence the jury could consider in reaching that ultimate conclusion. Because the blood alcohol content testimony was admitted, it was evidence before the jury, and the jury was never given any type of limiting instruction regarding that evidence.

[14] In his appellate brief, the defendant appears to conflate what are two separate arguments: that the video was not properly authenticated, and that the admission of the video violated his due process rights because it only showed selected parts of Richter's full encounter with the defendant and a video of the entire traffic stop had not been disclosed to him. As we will discuss more fully, these are, in fact, two separate claims, one of which was preserved at trial, and one of which was not.

[15] Our Supreme Court in *Swinton* set forth six factors for a court to consider when the authentication of computer generated evidence is in question. See *State* v. *Swinton*, supra, 268 Conn. 811–14; id., 811–12; (proponent must adduce testimony to establish that "(1) the computer equipment is accepted in the field as standard and competent and was in good working order, (2) qualified computer operators were employed, (3) proper procedures were followed in connection with the input and output of information, (4) a reliable software program was utilized, (5) the equipment was programmed and operated correctly, and (6) the exhibit is properly identified as the output in question" [internal quotation marks omitted]). Following *Swinton*, our Supreme Court held that the *Swinton* factors applied to video evidence that had been modified but not to video evidence that copied exactly footage from an original eight millimeter format to DVD by downloading the eight millimeter footage onto a computer hard drive and then copying that footage to DVD. *State* v. *Melendez*, supra, 291 Conn. 709–11.

[16] The prosecutor asked Richter on direct examination what portion of the stop was recorded on video, and he answered, "All of it." The prosecutor then asked whether the horizontal gaze nystagmus test was recorded on the video, and he responded, "Yes." Nonetheless, he explained that he "knew" this because his dashboard camera system engages when he activates his emergency lights. As explained further in this opinion, the video on the DVD entered into evidence began in the middle of the walk and turn test; Richter could not explain, when asked, why the DVD did not include additional footage.